Filed 7/27/17; reposted to provide correctly formatted opinion

CERTIFIED FOR PARTIAL PUBLICATION*

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E064206 |
| v. | (Super.Ct.No. RIF1310007/ RIF1403693) |
| JASON ARRON ARREDONDO, | |
| Defendant and Appellant. | O P I N I O N |

APPEAL from the Superior Court of Riverside County.  David A. Gunn, Judge. Affirmed with directions.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and A. Natasha Cortina, Meagan Beale, and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III.B., C., D., E., F., and G.

## I. INTRODUCTION

A jury found defendant and appellant, Jason Arron Arredondo, guilty of 14 sex offenses against four girls, namely, his three stepdaughters, F.R., A.J.R., A.M.R., and another girl, M.C., a friend of F.R.'s.[1] Defendant was sentenced to 33 years plus 275 years to life in state prison.

In the published portion of this opinion, we address defendant's claim that his Sixth Amendment right to "face-to-face" confrontation was violated when the trial court allowed a computer monitor on the witness stand to be raised by several inches to allow F.R. (age 18), A.J.R. (age 14), and A.M.R. (age 13), to testify without having to see defendant. We find no confrontation clause violation. The parties agree the matter must be remanded for resentencing on counts 1, 12, and 14. We remand the matter for resentencing and affirm the judgment in all other respects.

---

[1] Defendant was convicted of 11 counts of committing a lewd act on a child under age 14 (Pen. Code, § 288, subd. (a); counts 2-11, 13) (all further statutory references are to the Penal Code unless otherwise indicated), one count of a lewd act on a child under age 16 (§ 288, subd. (c)(1); count 1), one count of oral copulation with a child under age 14 (§ 288a, subd. (c)(1); count 12), and one count of sexual penetration with a child under age 14 (§ 289, subd. (j); count 14). The jury also found that defendant engaged in substantial sexual conduct in counts 2 through 11 and 13 (§ 1203.066, subd. (a)(8)), and that these counts were committed against more than one victim (§ 667.61, subd. (e)(4)). Defendant admitted he had a prior conviction, on February 2, 1999, for committing a lewd act on a child under age 14. (§ 288, subd. (a).)

## II. FACTUAL BACKGROUND

A. *Prosecution Evidence*

### 1. General Background

Defendant was born in 1974. For several years, until September 2013, defendant lived with his girlfriend, A.G., her two sons, and her three daughters, F.R., A.J.R., and A.M.R. The three girls, along with F.R.'s best friend M.C., testified at trial, in June 2015, that defendant repeatedly molested them when they were under the ages of 14, and in F.R.'s case, when she was also under the age of 16. Two adult female witnesses also testified that defendant molested them, years earlier, when they were under the ages of 14 and 16. (Evid. Code, § 1108.)

Around 2011, when F.R. was age 14, she, her siblings, her mother, and defendant (the family) moved into a four-bedroom house on Olive Street in Perris, where F.R., A.J.R., and A.M.R. shared a bedroom. Defendant's mother, Mrs. A., and one of his brothers also lived in the Olive Street house. Before moving into the Olive Street house, the family lived on Eugene Street in Perris. Before that, the family lived with defendant's mother in Corona and stayed with A.G.'s mother in Canyon Lake.

### 2. Sexual Assaults on M.C.

M.C., born in 1999, was a 16-year-old high school junior at the time of trial in June 2015. At that time, M.C. and F.R. had been best friends for eight years. M.C. first met defendant when she was around 13 years old and in the 7th grade. M.C. often visited the family at the Olive Street house.

3

Once, when M.C. was 13 years old, she spent the night at the Olive Street house and slept on A.M.R.'s lower bunk bed. Around 5:00 a.m., M.C. woke and found defendant sitting next to her, rubbing her leg with his arm. Defendant left the room when he saw M.C. was awake. M.C. called her parents to pick her up because she was scared. Another time, M.C and F.R. were in the garage at the Olive Street house trying on "dirt" biking gear. Defendant was helping M.C. adjust her shirt when he put his hands inside her shirt and grabbed her breasts. M.C. gave defendant a "weird" look, and defendant apologized.

On another occasion, after the incident in the garage, defendant was "throwing" M.C. and other children around in the swimming pool at the Olive Street house when he touched M.C. in her vaginal area, on her "butt," and "on [her] breast area." After the pool incident, in July 2013, M.C. was lying on a bed, coughing, in the girls' bedroom at the Olive Street house. Defendant came into the room, put his hand in M.C.'s shirt and "squeezed" her breast, saying he was checking something. Later that day, M.C. asked F.R. whether defendant had done anything like that to her. F.R. kept her head down and seemed "really eager" to change the subject.

Around one week after the coughing incident, on July 26, 2013, M.C. and F.R. were lying on their stomachs on a bed, talking on their phones, when defendant began massaging their backs over their shirts. Defendant gradually moved his hands lower and began touching their butts. F.R. "yelled" at defendant to stop and leave the room, and

4

defendant left.  M.C. specifically recalled that the "butt massage" incident occurred on July 26, 2013, because later that evening she was struck by a car.

As fresh complaint evidence,[2] M.C. testified that during the evening of July 26, 2013, F.R. told M.C. that something had happened between F.R. and defendant.  After that disclosure, M.C. told F.R. that M.C. needed to ask F.R.'s younger sisters whether defendant had ever hurt them.  M.C. and F.R. then spoke with A.J.R., who immediately began to cry and disclosed what had happened to her.  M.C. next spoke with A.M.R., who said something had happened to her too.  Around September 2013, M.C. disclosed the molestations to a school counselor, then spoke with the police.  Shortly thereafter, defendant was arrested.

3.  Sexual Assaults on F.R.

F.R., born in 1997, was an 18-year-old high school junior at the time of trial.  She recalled that she was seven years old when defendant became her mother's boyfriend, and eight years old when defendant began touching her inappropriately.  The molestations continued in all four of the homes in which the family lived.  The first touching occurred one morning when F.R. was eight years old (around 2005), after F.R., other family members, and defendant had been sleeping on the floor at defendant's

---

[2]  Under the fresh complaint doctrine, "proof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose—namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others—whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred." (*People v. Brown* (1994) 8 Cal.4th 746, 749-750.)

mother's house in Corona. While F.R. pretended to be asleep, defendant held F.R.'s hand on his penis and moved her hand. On a later occasion at the Corona house, when F.R. was still age eight, defendant either vaginally or anally penetrated F.R. while she pretended to be asleep on the living room sofa. Defendant also penetrated F.R. either vaginally or anally on another occasion at A.G.'s mother's house in Canyon Lake. Another time, when F.R. was in the 3rd to the 5th grade, defendant touched her with his penis. Defendant frequently touched F.R.'s breasts, over and under her clothes, and would apologize, saying it was an accident. F.R. denied ever seeing defendant's penis, because her eyes were always closed.

4. <u>Sexual Assaults on A.J.R.</u>

A.J.R., who was born in 2000, was age 14, and in 10th grade at the time of trial, testified defendant first molested her when she was age eight (around 2008). The molestations continued, once or twice weekly, for the "whole time" the family lived in the Olive Street house when A.J.R. was 11 to 12 years old. Defendant would tell A.J.R. he needed her to help him in the garage, and she was too scared to say no. He would take her pants and underwear off or tell her to do so. He would touch her with his hands on her breasts and her vaginal area, and he would have her touch his penis. He orally copulated her twice, and had her engage in both vaginal and anal intercourse with him.

Defendant penetrated A.J.R. with his fingers and penis in the garage, in his room, in her room, and in her brothers' room. Sometimes when A.J.R. was showering, defendant would remove his clothes and get into the shower with her, where he would

6

wash her, grab her hand, and tell her to hold onto and wash his erect penis. It hurt when defendant was sexually assaulting A.J.R., but she complied and did not disclose the abuse because she was scared. Defendant had anal sex with A.J.R. nearly every time he said he needed her in the garage. She would lie on the sofa in the garage, usually with her clothes off, and he would lay on top of her. Once, while having anal sex with her, defendant told A.J.R. to hold on a little longer. Defendant did the same things to A.J.R. before they lived in the Olive Street house.

Defendant told A.J.R. not to tell her mother, A.G., about the molestations. At one point, A.J.R. wrote a note to A.G. about the molestations and put the note in her mother's purse. A.G.'s purse was messy, however, and A.J.R. did not believe A.G. saw the note. Around one week after A.J.R. wrote the note, A.G. and defendant picked up A.J.R. from school, and defendant promised A.J.R. "it would never happen again" without saying what he was talking about. A.J.R. was in 6th or 7th grade at the time, and A.G. was crying. A.G. "just looked [A.J.R.] in the eye and just held [her] hand."

During the 2012-2013 school year, when A.J.R. was in 7th grade, she wrote in one of her textbooks: "I took a dick up my ass. Feels good," "Tek Wood [A.J.R.'s brother's friend] needs to put his dick in my ass. He's hot," "But your dick does. It grows. I saw my dad's, I know. I saw a pic when he was small and rite (sic) now." She also wrote "me and my stepdad," and "[h]is dick," with an arrow pointing to a picture, and another arrow pointing to a picture that said "[m]y vagina." She wrote, "I'm not a virgin. My stepdad had sex with me. I'm saying the truth." A.J.R. testified the writings were a joke

7

but that she also wanted people to know about the molestations. Her teacher saw the writings and discussed them with A.J.R. around the time the police were investigating the case. Defendant told A.J.R. that the molestations were their secret, and if she told anyone about them he would go to jail.

     5. <u>Sexual Assaults on A.M.R.</u>

A.M.R. was age 13 and in 8th grade at the time of trial. She testified that defendant molested her in the Olive Street house and its garage when she was 11 years old. Defendant would come into her bedroom while she was sleeping and touch her vaginal area under her clothes. Around 10 times, he digitally penetrated her vagina with his fingers. She began wearing one-piece pajamas and thicker clothing to make it more difficult for defendant to molest her, but when she did so, around five times, he touched her vaginal area outside her clothes. She would move away from defendant when he was touching her, but he would move her back. About five times in the swimming pool at the Olive Street house, defendant moved her bathing suit to the side and digitally penetrated her vagina.

     6. <u>Evidence of Defendant's Prior Sexual Assaults (Evid. Code, § 1108)</u>

        (a) *C.B.*

C.B., born in 1983 and age 32 at trial, testified that defendant's younger brother, J., was her boyfriend when she was age 13 and in middle school, around 1996. Defendant and J.'s stepsister was her best friend. C.B. lived in the same apartment complex where J. and defendant lived with their father. Defendant was nine years older

8

and much taller and heavier than C.B.  One day, when she was age 13, C.B. was with J. and his stepsister at defendant's father's apartment.  C.B.'s hair became knotted, and she went into the father's master bedroom shower to wash and condition her hair.  She locked the bedroom and bathroom doors behind her because defendant had been "very touchy-feely" with her.  When she got out of the shower, she heard a knock on the bathroom door and, thinking it was J., opened the door.  Defendant was there, asked her what she was doing, and she explained what she was doing.  Defendant grabbed her towel from her, leaving her naked.  She ran up to defendant to cover herself, and asked for her towel back, but defendant pushed his way into the bathroom, closing the door behind him.

Defendant grabbed C.B., pushed himself against her, and pushed her into the sink counter, while rubbing his lower body against her.  He rubbed her breasts and vaginal area with his fingers.  Then he picked her up and put her on the sink counter, took his penis out of his pants, and tried to insert it inside her.  He had one arm behind her back to hold her close to him, and put his penis inside of her with his other hand.  She was telling him to stop, but he did not.  She began to yell for J., but defendant covered her mouth with his other hand.  She hit the bathroom window, trying to break it, but was unable to.

Defendant forced his penis inside her for a couple of minutes, ejaculated on the counter, told her to get dressed, and left.  C.B. had blood on her back from being scraped on the sink faucet.  She quickly rinsed off the blood in the shower, got dressed, and ran out of the apartment.  She told J. about the incident, but she did not tell anyone else or report the incident to the police because she was scared.

9

In a later incident, C.B. was having a sleepover with J.'s stepsister in defendant's father's apartment. C.B. and the stepsister were sleeping in the living room when defendant and his girlfriend came into the apartment. C.B. later woke to find defendant rubbing her vaginal area with his fingers. She told defendant to stop, and defendant told her to be quiet. C.B. kept getting louder in telling defendant to stop. Defendant finally stopped and went into the bedroom.

On another occasion, C.B. went with defendant in his truck to pick up his girlfriend from work. The three of them were going to a family barbecue. Before he picked up his girlfriend, defendant pulled his truck behind some of the stores in the center where his girlfriend worked, and parked the car where no one would see him and C.B. He got out of the car, opened the passenger door, and tried to get C.B. out of the truck by pulling her legs out of the door. C.B. was fighting back and did not want to get out of the truck. Defendant pulled C.B.'s pants down to her knees, as C.B. was telling him to stop and trying to pull her pants back up. Defendant's erect penis was out of his pants, and he tried to get on top of her and have sex with her. After C.B. began to cry, defendant stopped and told her to get dressed.

Defendant inappropriately touched C.B. too many times for her to recall. Many times he would grab her breasts, vaginal area, and buttocks. Another time, when C.B. was staying the night at defendant's mother's house, defendant tried to get in bed with C.B. and touched her vaginal area. C.B. kept going to defendant's family's home because she loved J. When C.B. was around age 15, her mother learned what defendant

10

had done and reported the matter to the police. C.B. did not tell the police everything defendant had done, because she was "young and scared" and it was "overwhelming" to her. Several years before trial in June 2015, C.B. ran into defendant in Lake Havasu, Arizona, while she was on vacation. Defendant apologized to C.B. and said he was willing to accept responsibility for what he had done to her.

(b) *R.G.*

Defendant's cousin, R.G., born in 1980 and age 34 at trial, testified that defendant, his older brother, and his father lived with R.G.'s family in San Diego for around one month when R.G. was in elementary school. Defendant repeatedly molested R.G. during the month he lived in her home. He would grab her buttocks over her clothes, have her sit on his lap while he was erect, lift her skirt and touch her bottom, put his mouth on her face, and tell her it would help him grow. He also told her not to tell anyone what he was doing. R.G. told her mother that defendant grabbed her butt, but she did not report the other details of abuse to anyone because she was scared and did not want to disrupt her mother's relationship with her uncle, defendant's father.

7. Additional Prosecution Evidence

Investigators discovered that defendant's cell phone contained a photograph, dated June 17, 2013, of a semi-clothed female with a male's hand on her buttocks. The photograph had the word "www.teenku.com" written on the top, indicating it came from that Web site.

B.  *Defense Evidence*

The defense called A.J.R. and F.R. to testify and asked each of them whether there was anything abnormal about defendant's penis.  A.J.R. said it looked "[n]ormal, I guess" and F.R. testified she never saw it and could not describe it.  The defense then adduced photographs of defendant's penis, taken by the defense investigator in 2015, showing a discoloration of the skin.

Defendant called C.H., defendant's friend of 35 years, who testified defendant was "[l]ike a brother" to him, and he often visited the family at the Olive Street house.  C.H. claimed that F.R., A.J.R., and A.M.R. never appeared uncomfortable around defendant. Defendant would discipline the girls and none of them, especially F.R., liked being disciplined by defendant.  Defendant was a welder, often traveled for work, and would be gone for weeks at a time.  At the Olive Street house, the garage door was "always open," it could only be closed from the outside, and it was very difficult to close.  C.H. did not recall a sofa being in the garage.

Defendant's mother, Mrs. A., testified she lived with defendant, A.G., and A.G.'s five children from the summer of 2009 until defendant was taken into custody around September 2013.  Defendant worked long days; he would leave for work at 4:00 a.m. and return home at 5:00 or 6:00 p.m.  He also traveled for work and was away from home for long periods of time.  He was a father figure to all of A.G.'s children, and the three girls, especially F.R., appeared to resent him for disciplining them.  A.J.R. became angry, swore, and slammed doors when defendant disciplined her for lying.  At times, M.C. was

12

not welcome in the home because she set a bad example for the other children.  F.R. would yell at A.G., wanted to go to parties, and once ran away from home for one month. When defendant was absent from the home, the children had "full rein" and "no discipline."

The defense elicited testimony from C.H. and Mrs. A. that defendant was a person of good character who was unlikely to molest children.  We discuss this testimony below in connection with defendant's claim that the trial court erroneously allowed the prosecutor to impeach C.H. and Mrs. A. by asking them whether their opinions of defendant would change if they knew defendant had a prior conviction for committing a lewd act on a child under age 14.  (§ 288, subd. (a).)

C.  *Prosecution Rebuttal Evidence*

In order to show defendant's penis was not discolored, the prosecution played a video, taken from defendant's cell phone, showing his penis.

### III.  DISCUSSION

A.  *Defendant's Confrontation Claim Fails Regarding F.R., Was Forfeited Regarding A.J.R. and A.M.R., and No Ineffective Assistance of Counsel Is Shown*

Defendant claims his "face-to-face" confrontation rights were violated when the trial court allowed a computer monitor on the witness stand, which was normally used for witnesses to view exhibits while testifying, to be elevated by several inches to allow F.R., A.J.R., and A.M.R. not to have to see defendant as they testified.  Defendant argues that the raising of the monitor violated his Sixth Amendment right to face-to-face

13

confrontation because it blocked his "entire view" of the girls, and the girls' view of him, as the girls testified.

As we explain, there was no confrontation violation regarding F.R. The record supports the court's finding that raising the computer monitor in order to block F.R.'s view of defendant while F.R. testified—which also blocked defendant's view of F.R.— was necessary in order to protect F.R. from severe emotional trauma from having to testify with defendant looking at her. Defendant has forfeited his Sixth Amendment claim regarding A.J.R. and A.M.R., and on this record, defendant has not demonstrated that his counsel rendered ineffective assistance of counsel in failing to object when the monitor was raised while A.J.R. and A.M.R. testified.

1. Relevant Background

Of the six witnesses who testified that defendant molested them when they were minors, M.C. testified first, followed by F.R., A.J.R., A.M.R., C.B., and R.G. The defense briefly called A.J.R., then F.R., to testify. F.R. stepped up to the witness stand to be sworn and testify for the prosecution at 10:30 a.m. The court asked F.R. whether she needed a moment, and she said, "I think so." The court said it would take a brief recess.

Outside the presence of the jury, the court told the prosecutor to have the victim-witness advocate for F.R. spend some time with F.R., and after that to "let [the court] know if she is able to proceed or ready to proceed and we will resume." The prosecutor said she would ask F.R. whether she preferred the advocate to sit behind F.R. while F.R.

14

testified.  The court said, "Oh, yes.  Right.  If there's something like that that you can do that would make her more comfortable, I'm fine with that."

The court's minute order shows the recess lasted one-half hour, until 11:00 a.m., and was taken "to allow for witness composure."  F.R. began testifying at 11:05 a.m.  Before F.R. began testifying, the court noted it had made "some modifications to the witness box to accommodate" F.R.  F.R.'s victim-witness advocate also sat near F.R. while she testified.  During the next recess at 11:53 a.m., the court said:  "I just want to note for the record that I had mentioned earlier that the witness box had been reconfigured a little bit.  It's not a big change, but the monitor was placed kind of to the witness's right, apparently blocking at least some of her view of [defendant]."  The court then asked defense counsel whether he had anything he wanted to say about that.

Defense counsel responded:  "Yes I did.  Your Honor.  It does block [defendant's] entire view of the witness."  The court replied:  "Well, he is present in court.  He can hear the witness, hear her answers.  I think it's appropriate given her initial reaction.  Again, for the record when she first came in to take the oath, she was unable to proceed at that time.  We took about a 15-minute break before she could get her emotions back in order."[3]  Defense counsel next pointed out that defendant was unable to see F.R. as she

---

[3]  The court noted defense counsel had objected to some of the prosecutor's questions of F.R. as leading, and the court agreed that some of the questions were leading but was giving the prosecutor "some leeway in terms of the questioning."  The court explained that, though F.R. was 18 years old, she seemed "fairly immature."  On that point, defense counsel noted that F.R. was 18 years old and "not a child," but an adult.

15

testified and was accordingly unable to assist defense counsel in knowing whether F.R. was not telling the truth or "feigning something." Defense counsel had never seen F.R. before, but defendant had been her "quasi parent" and knew how she looked when she was not telling the truth.

The court overruled the confrontation objection, explaining: "It's a fairly small computer monitor that's on the witness stand. It's there for the witness to be able to view photographs that are shown on the monitor. Again, it was simply repositioned so that the witness doesn't have to look at [defendant]. I think—at best it's a small infringement on his confrontation rights. I think it's an allowable infringement on his right to confrontation . . . it's a very limited blockage, if you will."

At that point, the prosecutor clarified that the monitor was in the same place it was in when M.C. testified but it was "elevated" by placing two books beneath it—a Penal Code volume and a CALCRIM volume. The prosecutor argued this was appropriate, "[g]iven that [F.R.] had indicated that the defendant looked at her the first time she came [into the courtroom]." The court thanked the prosecutor for noting that the books had been placed beneath the monitor as the court "didn't see that."

Defense counsel then pointed out that F.R. began crying "before she was even able to see [defendant's] face," and that defendant "made no effort to look at her, intimidate her, or make any kind of eye contact or suggestive contact with her." The court responded: "I understand. I'm not casting any aspersions at this point. But it clearly affected her, and I think it's appropriate for the court to take whatever small efforts it can

16

. . . to make F.R. more comfortable without infringing on any of [defendant's] constitutional rights. . . ."

After both sides rested but before closing arguments, the prosecutor noted for the record that "the monitor on the witness stand was elevated for various witnesses. Starting with [F.R.], it was elevated. It remained elevated through [F.R., A.J.R., and A.M.R.] It was then removed for [C.B.] through the rest of the People's case. It was put back for the children [A.J.R. and F.R.] yesterday morning [when they were called by the defense]. It then did not move until after the end of yesterday, which was with [Mrs. A.], and it has not been there today." The record thus shows that raising the computer monitor by several inches was the *only* modification the court made to the witness box and to the entire courtroom while F.R., A.J.R., and A.M.R. testified.

2. Applicable Legal Principles

The confrontation clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." The confrontation clause "guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." (*Coy v. Iowa* (1988) 487 U.S. 1012, 1016 (*Coy*).) The right to face-to-face confrontation is not absolute, however, and alternative procedures may be used when (1) necessary to further an important or compelling state interest, and (2) the reliability of the testimony is otherwise assured. (*Maryland v. Craig* (1990) 497 U.S. 836, 844, 850 (*Craig*).)

17

The defendant in *Coy* was convicted of sexually assaulting two 13-year-old girls. (*Coy*, *supra*, 487 U.S. at p. 1014.) The girls were allowed to testify against the defendant through a large screen, which allowed the defendant "dimly to perceive" the girls but which blocked the girls' entire view of the defendant. (*Id*. at pp. 1015, 1020.) The defendant objected to the use of the screen on confrontation grounds. (*Id*. at p. 1015.) The high court reversed the judgment, finding that the use of the screen violated the defendant's right to face-to-face confrontation. (*Id*. at pp. 1020-1021.)

*Coy* emphasized that the Sixth Amendment's guarantee of face-to-face encounters between the criminally accused and their accusers has "a lineage that traces back to the beginnings of Western legal culture." (*Coy*, *supra*, 487 U.S. at pp. 1015-1016.) Like the right to cross-examine one's accusers, which is "a less explicit component of the Confrontation Clause," the right to face-to-face confrontation ensures the integrity of the factfinding process. (*Id*. at pp. 1019-1020.) *Coy* elaborated: "The State can hardly gainsay the profound effect upon a witness of standing in the presence of the person the witness accuses, since that is the very phenomenon it relies upon to establish the potential 'trauma' that allegedly justified the extraordinary procedure [the use of the screen] in the present case. That face-to-face presence may, unfortunately, upset the truthful rape victim or abused child; but by the same token it may confound and undo the false accuser, or reveal the child coached by a malevolent adult. It is a truism that constitutional protections have costs." (*Id*. at p. 1020.)

18

*Coy* also emphasized that face-to-face confrontation plays an essential role in ensuring the defendant receives a fair trial, which the high court in *Craig* later referred to as "the strong symbolic purpose" served by requiring adverse witnesses at trial to testify in the presence of the accused:  "[T]here is something deep in human nature that regards face-to-face confrontation between accused and accuser as 'essential to a fair trial in a criminal prosecution.'  [Citation.]  . . . The phrase still persists, 'Look me in the eye and say that.'"  (*Coy*, *supra*, 487 U.S. at pp. 1017-1018; *Craig*, *supra*, 497 U.S. at p. 847.)  "The perception that confrontation is essential to fairness has persisted over the centuries because there is much truth to it. . . . It is always more difficult to tell a lie about a person 'to his face' than 'behind his back.'  . . . The Confrontation Clause does not, of course, compel the witness to fix his eyes upon the defendant; he may studiously look elsewhere, but the trier of fact will draw its own conclusions."  (*Coy*, *supra*, at p. 1019.)

*Coy* declined to determine whether there were any exceptions to the right to face-to-face confrontation, given that the trial court made no "individualized findings" that the child witnesses needed any "special protection."  (*Coy*, *supra*, 487 U.S. at p. 1021.)  An Iowa statute authorized the use of the screen to block the defendant's and the witnesses' views of each other, but the high court emphasized that the "generalized finding[s]" or "legislatively imposed presumption of trauma" to the witnesses, underlying the Iowa statute, were insufficient to justify depriving the defendant of his Sixth Amendment right to face the witnesses at trial.  (*Ibid.*)  *Coy* stated:  "Since there have been no

individualized findings that these particular witnesses needed special protection, the judgment here could not be sustained by any conceivable exception." (*Ibid*.)

In 1990, two years after *Coy* was decided in 1988, *Craig* clarified that the right to face-to-face confrontation is not absolute, and alternative procedures may be used when it is shown that (1) such procedures are "necessary to further an important public policy," and (2) "the reliability of the testimony is otherwise assured." (*Craig*, *supra*, 497 U.S. at pp. 849-850.) *Craig* involved a six-year-old alleged child abuse victim who testified against the defendant by one-way closed-circuit television. The defendant, the trial judge, and the jury were in the courtroom while the child was in another room being examined by the prosecutor and defense counsel. A video monitor recorded and displayed the child's testimony to those in the courtroom. The child could not see the defendant as she testified, but the defendant could see the child, and the defendant was in electronic communication with her defense counsel while the child testified. (*Id*. at pp. 840-842.)

Regarding the reliability of the child's testimony, *Craig* emphasized that the Maryland statute preserved all of the "other" elements of the right to confrontation: "The child witness must be competent to testify and must testify under oath; the defendant retains full opportunity for contemporaneous cross-examination; and the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies. . . . [T]he presence of these other elements of confrontation—oath, cross-examination, and observation of the witness' demeanor—

adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing . . . ." (*Craig*, *supra*, 497 U.S. at p. 851.) *Craig* thus concluded that use of the one-way closed-circuit television procedure did not "impinge on the truth-seeking or symbolic purposes of the Confrontation Clause." (*Id*. at p. 852.)

Regarding the state's interest in protecting child witnesses, *Craig* reasoned that a state's interest in "'the protection of minor victims of sex crimes from further trauma and embarrassment,'" or in "'safeguarding the physical and psychological well-being of a minor'" is not just an important state interest, but a "'compelling'" one, and such interest, "may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court." (*Craig*, *supra*, 497 U.S. at pp. 852-853.) *Craig* thus held that "if the State makes *an adequate showing of necessity*, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of *a special procedure* that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant." (*Id*. at p. 855, italics added.)

*Craig* explained that "the requisite finding of necessity" must be "case-specific" and the trial court must make several findings of case-specific necessity before allowing a witness to testify by means of a procedure other than face-to-face confrontation with the defendant: "The requisite finding of necessity must of course be a case-specific one: The trial court *must hear evidence* and determine whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child

21

witness who seeks to testify. [Citations.] The trial court must also find that the child witness would be traumatized, not by the courtroom generally, but by *the presence of the defendant*. [Citations.] Denial of face-to-face confrontation is not needed to further the state interest in protecting the child witness from trauma unless it is *the presence of the defendant* that causes the trauma. . . . Finally, the trial court must find that the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis*, *i.e.*, more than 'mere nervousness or excitement or some reluctance to testify,' [citations]." (*Craig*, *supra*, 497 U.S. at pp. 855-856, all except latter italics added.)

*Craig* concluded that the Maryland statute met these constitutional standards by requiring the trial court to determine that the child witness would suffer "'serious emotional distress such that the child cannot reasonably communicate.'" (*Craig*, *supra*, 497 U.S. at p. 856.) *Craig* declined to decide the minimum showing of emotional trauma required to meet these constitutional standards. (*Ibid.*)

In a subsequent California case, *People v. Sharp* (1994) 29 Cal.App.4th 1772 (*Sharp*), disapproved on other grounds in *People v. Martinez* (1995) 11 Cal.4th 434, 452, the prosecutor was allowed to sit in a chair to the right of the witness stand so that a child witness could focus on the prosecutor and not have to look at the defendant while the child testified. The child could see the defendant if she turned her head, and the defendant's view of the child was "limited only in his view of a portion of her face." (*Sharp*, *supra*, at pp. 1781-1784.) The defendant was on trial for sexually abusing the child when she was eight years old. (*Id*. at pp. 1776, 1778.)

22

*Sharp* held the alternative seating arrangement for the child satisfied the two-part test of *Craig:* The reliability of the child's testimony was assured, because the child testified in court, under oath, and was subject to contemporaneous cross-examination. And, though the trial court made no express findings that the alternative seating arrangement was necessary to protect the child from emotional trauma, the record amply supported such a finding. The child was having "difficulty focusing" and was under "considerable distress" while she testified for two hours *before* the prosecutor's chair was moved and the child could testify facing away from the defendant. (*Sharp*, *supra*, 29 Cal.App.4th at pp. 1783-1786 & fn. 5.) While seated facing the defendant, the child was "unable to participate effectively in the proceedings." (*Id*. at p. 1783.)

Based on its "careful review" of the record, *Sharp* reasoned that blocking the defendant's view of "only a portion" of the child's face was a "minor interference" to the defendant's confrontation rights, "fully justified" by the circumstances of the case. (*Sharp*, *supra*, 29 Cal.App.4th at p. 1784.) *Sharp* pointed out that defendant's "interest in having a literal face to-face meeting" with the child had to be balanced against two "important interests" of the state: (1) protecting the child from "unnecessary emotional trauma" and (2) obtaining the child's "complete and accurate" testimony. (*Id*. at p. 1783, citing *Craig*, *supra*, 497 U.S. at pp. 845-846.)

In the more recent California Supreme Court case of *People v. Gonzales* (2012) 54 Cal.4th 1234 (*Gonzales*), the state high court followed *Sharp* and found no confrontation violation in circumstances substantially similar to those in *Sharp*. (*Gonzales*, *supra*, at

pp. 1267-1268.)  The defendant in *Gonzales* was tried and convicted of the torture-murder of his four-year-old niece, Genny.  (*Id*. at p. 1242.)  Genny lived with the defendant, his wife, and their six children, including their oldest son, Ivan, Jr.  (*Id*. at pp. 1242-1243.)  Ivan, Jr. was eight years old when he testified at his father's preliminary hearing.  Ivan, Jr. testified to events he witnessed on the night of Genny's murder, that he had previously seen his mother and the defendant severely abuse Genny, and that he feared his father.  (*Id*. at pp. 1247-1248.)  Ivan, Jr.'s preliminary hearing testimony was admitted at the defendant's trial in lieu of his live testimony.  (*Id*. at pp. 1247, 1261; Evid. Code, § 1291.)

At the preliminary hearing, the court granted the prosecutor's motion to allow Ivan, Jr. and other "juvenile witnesses" to be seated "*facing away*" from the defendant. (*Gonzales*, *supra*, 54 Cal.4th at p. 1265, italics added.)  The podium for counsel was placed so that the lawyers had eye contact with the witnesses, and the witnesses were "free to look around the courtroom and make eye contact" with the defendant, "if they desired." (*Ibid*.)  On appeal, the defendant claimed the admission of Ivan, Jr.'s preliminary hearing testimony at trial violated his confrontation rights because the preliminary hearing court did not make "a case-specific factual finding of necessity for an alternative arrangement for Ivan, Jr.'s testimony, as required under *Craig*." (*Id*. at p. 1266.)  The defendant argued the prosecution "made no factual showing" at the preliminary hearing "to support its claim" that Ivan, Jr. feared his parents. (*Ibid*.)  The defendant did not challenge the *trial court's* finding that Ivan, Jr. was unavailable to

testify due to the trauma he would suffer if made to testify. (*Id.* at p. 1261; Evid. Code, §§ 240, 1291.)

In rejecting the defendant's confrontation claim, *Gonzales* first noted that the defendant had no right to "personally" confront Ivan, Jr. at the preliminary hearing, because confrontation is a trial right that does not apply "with full force" at a preliminary hearing, and Ivan, Jr.'s testimony could have been presented through hearsay testimony by police officers without offending the state or federal Constitution. (*Gonzales*, *supra*, 54 Cal.4th at p. 1267, citing *People v. Miranda* (2000) 23 Cal.4th 340, 348-349.) *Gonzales* reasoned: "Thus, there was no occasion for the preliminary hearing court to make *Craig* findings, and defense counsel did not request them." (*Gonzales*, *supra*, at p. 1267.) Regarding the defendant's claim that the alternative seating arrangement violated his confrontation rights, *Gonzales* pointed out: "This is a particularly artificial argument, insisting on *Craig* findings even though no context for such findings ever arose. In any event, the claim fails on its merits." (*Ibid*.)

*Gonzales* proceeded to follow *Sharp* and conclude there was no confrontation violation, after noting that *Sharp* "involved the same seating arrangement at trial as was employed at defendant's preliminary examination." (*Gonzales*, *supra*, 54 Cal.4th at pp. 1267-1268.) *Gonzales* noted with approval *Sharp*'s observations that the alternative seating arrangement "'resulted in only the most minimal interference with appellant's right to confront his accuser'" and was "justified by the state's interest in protecting the

child witness and obtaining accurate testimony." (*Gonzales*, *supra*, at p. 1267, citing *Sharp*, *supra*, 29 Cal.App.4th at p. 1783.)

*Gonzales* also pointed out that: "While the trial court [in *Sharp*] had not made the findings required by *Craig*, the *Sharp* court had no difficulty ascertaining from the record that the seating arrangement was fully justified. [Citations.]" (*Gonzales*, *supra*, 54 Cal.4th at p. 1267.) *Gonzales* noted that "[o]ther state courts have approved the use of similar seating arrangements, without the findings required by *Craig*." (*Id.* at p. 1267, fn. 17 & cases cited.) And "while the preliminary hearing court made no factual findings on the need to shield Ivan, Jr. from defendant's gaze, the trial court made extensive findings that the child would be traumatized if he were made to testify at trial." (*Id*. at p. 1268.) The defendant did not "dispute the vulnerability of the young witness, either at the time of the preliminary hearing or the time of trial." (*Ibid*.) Thus, *Gonzales* concluded: "Here, as in *Sharp* . . . the seating arrangement for the child witness's testimony was fully justified by the record, and defendant's confrontation rights were not violated when the videotape was introduced at trial. The seating arrangement at the preliminary hearing satisfied the central concerns of the confrontation clause: 'physical presence, oath, cross-examination, and observation of demeanor by the trier of fact.' (*Craig*, *supra*, 497 U.S. at p. 846.)" (*Ibid*.)

### 3. Defendant's Sixth Amendment Claim Regarding F.R. Lacks Merit

#### (a) *The Two-Part Test of* Craig *Was Satisfied*

Defendant's confrontation claim involves mixed questions of law and fact. "We review de novo a claim under the confrontation clause that involves mixed questions of law and fact. [Citation.] Under this standard, we defer to the trial court's determination of 'the historical facts'—which 'will rarely be in dispute'—but not the court's 'application of [the] objective, constitutionally based legal test to [those] historical facts.' [Citation.]" (*People v. Giron-Chamul* (2016) 245 Cal.App.4th 932, 964, citing *People v. Cromer* (2001) 24 Cal.4th 889, 896-897, 899-901; *People v. Lujan* (2012) 211 Cal.App.4th 1499, 1505 (*Lujan*).) We apply the substantial evidence standard to the trial court's factual findings—whether those findings are express or may be inferred from the record. (See *Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [discussing standards of review applicable to predominantly legal and factual questions]; *People v. Powell* (2011) 194 Cal.App.4th 1268, 1284, fn. 6.)

As in *Gonzales* and *Sharp*, the record shows that the use of the computer monitor to block F.R.'s view of defendant, which also blocked defendant's "entire view" of F.R., satisfied the two-part test of *Craig*. First, the reliability of F.R.'s testimony was assured: F.R. testified under oath, subject to cross-examination, and the jury had an unobstructed view of F.R. while she testified. (*Craig*, *supra*, 497 U.S. at pp. 850, 857; *Gonzales*, *supra*, 54 Cal.4th at p. 1268; *Sharp*, *supra*, 29 Cal.4th at p. 1783.)

Second, the record supports the trial court's implied findings that the use of the computer monitor was necessary to further *two* important state interests: (1) protecting F.R. from suffering serious emotional trauma while testifying; and (2) obtaining F.R.'s "complete and accurate" testimony. (*Craig*, *supra*, 497 U.S. at pp. 850-852; *Gonzales*, *supra*, 54 Cal.4th at pp. 1267-1268; *Sharp*, *supra*, 29 Cal.App.4th at p. 1783.) The record shows F.R. was not merely crying or "uncomfortable" when she first stepped to the witness stand, but was so emotionally upset that she was unable to proceed and "participate effectively in the proceedings." (*Sharp*, *supra*, at p. 1783.) The record also shows that raising the computer to block F.R's view of defendant was necessary to allow F.R. to proceed and testify against defendant.

Though the trial court was not expressly asked to make a "case-specific finding" that repositioning the computer monitor to block F.R.'s view of defendant was necessary to further an important state interest (*Craig*, *supra*, 497 U.S. at pp. 855-856), the court effectively made this finding and substantial evidence supports it. In overruling defendant's confrontation objection, the court found that raising the monitor was "appropriate" given that F.R. was emotionally upset and "unable to proceed" when she first stepped to the witness stand. The court also indicated that the prospect of testifying while facing defendant "clearly affected" F.R. and was the cause of her emotional trauma and inability to proceed. In the court's words, the computer monitor was "simply repositioned so that the witness doesn't have to look at Mr. Arrendondo."

28

The record also supports the court's finding that F.R. was emotionally upset and unable to proceed *because* she had to testify facing defendant, and not merely because she had to testify or for any reason unrelated to defendant. (*Craig*, *supra*, 497 U.S. at p. 856.) Indeed, the entire on-the-record discussion between the court and counsel concerning the need to raise the computer monitor was based on F.R. being too upset to testify *because* she had to face defendant. Defense counsel raised no concern that F.R. was upset because she had to testify or for any reason unrelated to facing defendant. If F.R. had been upset for reasons unrelated to facing defendant, there would have been no point in repositioning the monitor to block F.R.'s view of defendant.

Here, as in *Gonzales*, defense counsel did not dispute that F.R. was too emotionally upset to proceed without the use of the computer monitor. (*Gonzales*, *supra*, 54 Cal.4th at p. 1268 ["Defendant does not dispute the vulnerability of the young witness, either at the time of the preliminary hearing or the time of trial."].) Instead, defense counsel protested that the monitor blocked defendant's entire view of F.R., preventing defendant from assisting defense counsel in knowing whether F.R. was telling the truth. In this regard, defense counsel noted defendant had done nothing to intimidate F.R. and that F.R. was crying even before she was able to see defendant. In response, the trial court said it was not "casting any aspersions" on defendant, but the prospect of having to testify while facing defendant had "clearly affected" F.R.

Now, however, defendant claims the trial court erroneously based its finding of a case-specific necessity for raising the computer monitor on the need to make F.R. "more

comfortable," rather than on the need to protect F.R. from serious or more than minimal emotional trauma, as *Craig* requires. (*Craig*, *supra*, 497 U.S. at p. 852.) Defendant argues the court used the "wrong standard" in finding that raising the computer monitor was necessary to protect F.R. from serious emotional trauma. We disagree.

Defendant's argument misconstrues the trial court's explanation for overruling his confrontation objection. Near the end of its discussion with counsel concerning the need to raise the computer monitor for F.R., the court said it was "appropriate for the Court to take whatever small efforts the Court can make to make [F.R.] *more comfortable* without infringing on any of [defendant's] constitutional rights . . . ." (Italics added.) The court made this "more comfortable" comment in response to defense counsel's representation that defendant made no attempt to look at or intimidate F.R. when she "first came in." In context, the court's "more comfortable" comment was a reference to its earlier finding that it was necessary to raise the monitor to protect F.R. from the emotional trauma of facing defendant while testifying. The record shows that making F.R. "more comfortable" was not the *basis* of the court's finding of a case-specific necessity to raise the computer monitor for F.R. Rather, the need to protect F.R. from serious emotional trauma and to render her able to testify were the reasons for raising the monitor. (*Gonzales*, *supra*, 54 Cal.4th at p. 1267; *Sharp*, *supra*, 29 Cal.App.4th at pp. 1783-1784.)

(b) *No Evidentiary Hearing Was Required*

Relying on *People v. Murphy* (2003) 107 Cal.App.4th 1150 (*Murphy*), defendant claims the trial court erroneously failed to hold an evidentiary hearing to determine

whether raising the computer monitor was necessary to protect F.R. from serious emotional trauma. We find *Murphy* distinguishable on this point.

*Murphy* involved a witness who was age 31 when she testified at trial through a "slightly darkened" "one-way glass." (*Murphy*, *supra*, 107 Cal.App.4th at pp. 1151-1153.) The glass prevented the witness from seeing the defendant but allowed the defendant and the jury to observe the witness's demeanor. (*Id*. at p. 1152.) The defendant was on trial for committing a forcible sex crime against the witness and for falsely imprisoning her, apparently when she was an adult. (*Id*. at pp. 1151-1152.) The trial court found the witness was "severely emotionally distraught" before the one-way glass was erected to block her view of the defendant (*id.* at p. 1152), but the court did not find the witness was distraught because she feared testifying in the presence of the defendant (*id*. at pp. 1157-1158).

In reversing the judgment, *Murphy* relied in part on the trial court's approval of the use of the one-way glass, "without holding an evidentiary hearing to determine whether, and to what degree, the testifying victim's apparent anxiety was due to the defendant's presence rather than, for instance, the witness's general emotional fragility or the trauma of testifying in court or revisiting a past experience . . . ." (*Murphy*, *supra*, 107 Cal.App.4th at pp. 1157-1158.) *Murphy* observed: "[A] court may not, as the court did in this case, dispense with complete face-to-face confrontation merely upon a prosecutor's unsworn representation that defendant's presence was part of a distraught adult witness's problem." (*Id*. at p. 1158.) *Murphy* thus concluded that the trial court's

31

ruling was not based upon "an adequate 'case-specific finding of necessity.'" (*Ibid.*, citing *Craig*, *supra*, 497 U.S. at p. 855.)

In contrast to *Murphy*, the need to raise the computer monitor to block F.R.'s view of defendant was not supported solely by the prosecutor's "unsworn representation" that F.R. was too upset to proceed because she feared testifying in the presence of defendant. (Cf. *Murphy*, *supra*, 107 Cal.App.4th at pp. 1157-1158.) To be sure, the prosecutor made an unsworn representation that raising the computer monitor was necessary to protect F.R.'s emotional well-being, "[g]iven that [F.R.] had indicated that the defendant looked at her the first time she came [into the courtroom]." But after defense counsel replied that defendant made no attempt to look at or intimidate F.R., the court pointed out that the prospect of having to face defendant "clearly affected" F.R. Thus, the record affirmatively shows—and defendant did not dispute—that F.R. was too emotionally upset to testify *because* she had to face defendant. The trial court did not reposition the monitor based solely on the prosecutor's unsworn representation that F.R. feared testifying in defendant's presence. Rather, it did so based on its own observations of F.R. and her inability to testify before the monitor was repositioned.

Additionally, defendant did not request an evidentiary hearing to determine whether F.R. was too emotionally upset to testify because she had to face defendant, or because she had to testify and recall the molestations, or for another reason. We are mindful that, in *Craig*, the high court noted that, in making the requisite finding of a case specific necessity, "[t]he trial court must hear evidence and determine whether use of the

32

one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify." (*Craig*, *supra*, 497 U.S. at p. 855.) But defendant has pointed to no authority requiring the court to hold an evidentiary hearing sua sponte when, as here, and in contrast to *Murphy*, the court made the requisite case-specific necessity finding under *Craig*. (*Craig*, *supra*, at p. 855; cf. *Murphy*, *supra*, 107 Cal.App.4th at pp. 1157-1158.)

In *Gonzales* and *Sharp*, no evidentiary hearings to determine the reasons for the child witnesses' trauma were requested or conducted. (*Gonzales*, *supra*, 54 Cal.4th at p. 1267; *Sharp*, *supra*, 29 Cal.App.4th at p. 1783 & fn. 4.) Yet the courts in each case upheld the alternative seating arrangements despite the absence of evidentiary hearings in the trial courts, given that the records in each case supported the trial courts' findings of case-specific necessity for the alternative procedures used. (*Gonzales*, *supra*, at pp. 1265-1268 [trial court made "extensive findings" that child would be traumatized if made to testify at trial, and the record "fully justified" allowing the child to testify facing away from the defendant]; *Sharp*, *supra*, at pp. 1783-1784 [record "fully justified" allowing child to look away from defense table while testifying].) Here, as in *Gonzales* and *Sharp*, the record fully justifies the court's finding that blocking F.R.'s view of defendant by raising the computer monitor was necessary to protect F.R. from suffering serious emotional trauma from having to face defendant in court, and to secure F.R.'s testimony.

(c) *Extending Craig's Protections to An Adult Witness/Child Abuse Victim*

*Murphy* reversed the judgment in part on the ground that no evidentiary hearing or case-specific finding of necessity was made, and on the additional ground that the witness was an adult, not a child.  (*Murphy*, *supra*, 107 Cal.App.4th at p. 1157.)  Unlike the child witnesses involved in *Craig* and *Sharp*, *Murphy* reasoned that the case before it did not "involve the 'State's traditional and '"transcendent interest in protecting the welfare of children."''"  (*Murphy*, *supra*, at p. 1157; *Craig*, *supra*, 497 U.S. at p. 855.)  *Murphy* also noted it had not been directed to "any authority recognizing or establishing that the state has 'transcendent' or 'compelling' interest in protecting adult victims of sex crimes from further psychological trauma that might result from testifying face-to-face with a defendant."  (*Murphy*, *supra*, at p. 1157.)[4]  Relying on this aspect of *Murphy*, defendant argues that protecting an 18-year-old adult witness like F.R. from the psychological or emotional trauma of face-to-face testimony is a "radical departure" from *Craig*.  Defendant urges this court to adopt a "*per se* rule" and hold that, once a child abuse victim turns age 18 and has thus reached the age of majority, the state no longer has an

---

[4] *Murphy* suggested it did not agree with the court in *People v. Williams* (2002) 102 Cal.App.4th 995 (*Williams*), which held that the trial court properly extended the "principles" "discusse[d]" in *Craig* in allowing an anxiety-stricken adult witness to testify by videotape while the defendant listened to her testimony from a detention cell. (*Williams*, *supra*, at pp. 1004-1008.)  *Murphy* noted that *Williams* did not identify any authority for the proposition the state had a transcendent or compelling interest in protecting adult victims of sex crimes from the further psychological trauma that might result from face-to-face confrontation.  As we discuss, *infra*, we agree with the *Williams* court's broader reading and extension of the principles discussed in *Craig* to protect adult witnesses from the additional emotional trauma of having to face the defendant in court.

interest in protecting the *former* child from the trauma of face-to-face confrontation.  We decline to adopt such a per se rule.

*Craig* observed that "'the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial,' [citation], a preference that 'must occasionally give way to considerations of public policy and the necessities of the case.'" (*Craig*, *supra*, 497 U.S. at p. 849.)  *Craig* specifically recognized that the state's "'compelling'" interest "in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court." (*Id.* at pp. 852-853.)  But *Craig* did not suggest the state no longer has an interest in protecting a child abuse victim from the emotional trauma of face-to-face confrontation *if* that victim happens to have turned age 18 by the time he or she is called upon to testify.  (*Id.* at pp. 849-853; see also *Lujan*, *supra*, 211 Cal.App.4th at pp. 1505-1506 [extending *Craig*'s protections to *all* child *witnesses* of sex crimes, not just child victims of sex crimes].)

In our view, it would be absurd to allow alternative procedures to face-to-face confrontation for child abuse victims *only if* they are still under age 18 by the time of trial, but deny the same protections to a child abuse victim who, like F.R., have turned age 18 but are no less vulnerable than a minor to the emotional trauma of face-to-face confrontation.  Such an arbitrary rule would "commit[] the very sin the Supreme Court condemned in *Coy*—that is, making a 'generalized finding' about the level of trauma certain groups of witnesses experience when confronting defendants." (*Lujan*, *supra*, 211

35

Cal.App.4th at p. 1506, citing *Coy*, *supra*, 487 U.S. at pp. 1020-1021.) Such an arbitrary rule would also require the trial court to treat a witness like F.R., who had turned age 18 only two months before she testified, less favorably than a minor witness who was almost but not yet age 18.

Additionally, *Craig* does not "mark[] the outer boundary" of when alternative procedures to face-to-face confrontation are constitutionally permissible. (*Lujan*, *supra*, 211 Cal.App.4th at p. 1505.) Trial courts have "constitutionally conferred, inherent authority to 'create new forms of procedure' in the gaps left unaddressed by statutes and the rules of court. [Citations.]" (*Id*. at p. 1507.) But courts may not sanction new procedures that are of "dubious constitutional validity." (*In re Amber S*. (1993) 15 Cal.App.4th 1260, 1266.) Whether the trial court has a particular inherent authority is a question of law subject to de novo review, and the court's exercise of its inherent authority is reviewed for an abuse of discretion. (*Lujan*, *supra*, at p. 1507.)

We discern no "dubious constitutional validity" or abuse of discretion in the trial court's decision to allow the computer monitor to be raised to protect 18-year-old 11th grade high school student F.R. from the emotional trauma of facing defendant while testifying, and, indeed, to enable F.R. to testify. (*Sharp*, *supra*, 29 Cal.App.4th at p. 1783.) *Craig* recognized that the right to face-to-face confrontation is not "an indispensable element of the Sixth's Amendment's guarantee of the right to confront one's accusers," and that the right "'must occasionally give way to considerations of public policy and the necessities of the case.'" (*Craig*, *supra*, 497 U.S. at pp. 849-850.)

36

*Sharp* and *Gonzales* also recognized that the state's important interest in obtaining a witness's testimony must be *balanced against* the right of the accused to face his or her accusers in court. (*Sharp*, *supra*, at p. 1783; *Gonzales*, *supra*, 54 Cal.4th at p. 1267.)

Defendant began molesting F.R. when she was only eight years old, and the molestations continued until F.R. was age 16, less than two years before trial. Although F.R. was age 18 when she testified, the trial court noted she seemed "fairly immature," and she was only a junior in high school. For several years, defendant had been F.R.'s stepfather, caretaker, and disciplinarian. F.R. was so distraught from having to face defendant, she was unable to testify before the computer monitor was raised to block her view of defendant. On these particular facts, the trial court did not abuse its discretion or violate defendant's confrontation rights in allowing the computer monitor to be repositioned while F.R. testified. (*Craig*, *supra*, 497 U.S. at pp. 852-853.)

Though we decline to adopt the per se rule urged by defendant, we emphasize that our holding is a narrow one and is based on the particular facts of this case. Generally, it is reasonable to expect that, once a child abuse victim or witness has reached the age of majority, he or she will not need protection from face-to-face confrontation. The older a child abuse victim is when called upon to testify about the abuse, the more difficult it will likely be for the state to make an "adequate showing of necessity" for using an alternative procedure to face-to-face confrontation. (*Craig*, *supra*, 497 U.S. at p. 855.)

Not all child abuse victims will require protection from face-to-face confrontation, whether they testify as children or after they reach age 18. For example, M.C. was age

16 when she testified, but the People did not claim she needed any protection from facing defendant in court. But other child abuse victims may need protection from face-to-face confrontation, whether they testify as children or adults. Child abuse victims like F.R., who are still young and emotionally or psychologically vulnerable, may need protection even though they have reached the age of majority when they testify. Likewise, child abuse victims who suffer from developmental delays or who are for other reasons particularly susceptible to psychological trauma may need protection from face-to-face confrontation, whether they testify as children or adults.

In each case, the trial court must determine whether the physical or psychological well-being of the child abuse victim or witness before it is sufficiently threatened, and is thus sufficiently important, to outweigh the defendant's right to face the child abuse victim in court. (*Craig*, *supra*, 497 U.S. at pp. 852-853; *Lujan*, *supra*, 211 Cal.App.4th at pp. 1505-1506.) A criminal defendant's constitutional right to face-to-face confrontation can never be lightly dismissed or overridden, given that it is at "'the core of the values furthered by the Confrontation Clause.'" (*Coy*, *supra*, 487 U.S. at p. 1017.)

(d) *The Computer Monitor Permissibly Blocked Defendant's Entire View of F.R.*

Defendant claims this case represents a "radical departure" from *Craig* because no court has sanctioned blocking the defendant's *entire view* of a witness as a permissible infringement on the defendant's right to face-to-face confrontation. Again, we disagree.

Defendant argues this case is indistinguishable from *Herbert v. Superior Court* (1981) 117 Cal.App.3d 661, decided several years before *Craig*. *Herbert* concluded that the defendant's confrontation rights were violated when a five-year-old child witness was allowed to testify at the preliminary hearing, while seated in the witness chair and facing the magistrate who was seated in the jury box. The defendant could hear the child but he could not see her because his view of her was obstructed by the bench. Before the magistrate approved the alternative seating arrangement, the child was "reluctant or unable to testify" and expressed fear of the defendant's presence. (*Herbert v. Superior Court*, *supra*, at pp. 664-665, 668.) Because *Herbert* preceded *Craig*, *Herbert* did not determine whether the alternative seating arrangement was necessary to protect the child from serious emotional trauma as a result of having to face the defendant in court. (*Craig*, *supra*, 497 U.S. at pp. 855-856.) *Sharp* distinguished *Herbert* on this ground. (*Sharp*, *supra*, 29 Cal.App.4th at pp. 1782-1783.) We do the same.

*Williams*, *supra*, 102 Cal.App.4th 995[5] is both more current and closely on point. *Williams* extended "the principles" discussed in *Craig* to allow an adult witness to testify by videotape—even though that alternative procedure did not allow the defendant to see the witness or view her demeanor as she testified. (*Williams*, *supra*, at pp. 1007-1008.)

In *Williams*, the adult witness, a victim of the defendant's alleged assaults and criminal threats, was allowed to testify in the courtroom, outside the presence of the jury and the defendant, while the defendant listened to her testimony from a detention cell but

[5] See footnote 4, *ante*.

39

could not see her as she testified. (*Williams*, *supra*, 102 Cal.App.4th at pp. 997, 999-1001, 1004-1006.) Defense counsel was allowed to go to the detention cell and confer with the defendant before defense counsel concluded his cross-examination of the witness. (*Id.* at p. 1006.) The adult witness's testimony was videotaped and played for the jury and the defendant—after the defendant and jury returned to the courtroom. (*Ibid.*) The jury was not allowed to know that the witness was unable to testify in front of the defendant. (*Ibid.*)

Before the trial court approved the videotape procedure, the witness's treating psychotherapist testified at a pretrial hearing that the witness would be unable to testify in the courtroom where all the parties were present. (*Williams*, *supra*, 102 Cal.App.4th at p. 1005.) In the doctor's opinion, "[t]he panic, anxiety and fear would overwhelm her" and she would be unable to "'think very clearly'" or "'even make sense'" while testifying in court "'because of the anxiety and her fear.'" (*Ibid.*) The doctor also opined the witness "would very likely become suicidal and would need to be hospitalized in a mental health unit" if forced to testify in the presence of the defendant. (*Ibid.*)

The pretrial hearing was held pursuant to the prosecution's motion to have the witness's prior videotaped statement admitted in lieu of her testimony at trial, pursuant to Evidence Code section 1370, which required the trial court to find the witness was unavailable to testify. (*Williams*, *supra*, 102 Cal.App.4th at p. 1004 & fn. 1.) The trial court in *Williams* did not approve of that more drastic alternative to face-to-face confrontation—testimony by closed-circuit television—and instead found the witness

would be deemed unavailable only if she had to testify in the presence of the defendant. (*Id*. at p. 1006.) In so ruling, the court said it took the defendant's right of confrontation and right to cross-examine "very seriously," and effectively balanced the defendant's confrontation rights against the need to protect the witness. (*Ibid*.) The court approved the less intrusive procedure of allowing the witness to testify by videotape, with the defendant listening in the detention cell. (*Ibid*.) In upholding the use of the videotape procedure on appeal, the *Williams* court reasoned that the "principles" "discusse[d]" in *Craig* were properly applied. (*Williams*, *supra*, at pp. 1007-1008.) Similarly here, the trial court did not impermissibly infringe on defendant's confrontation rights in allowing the computer monitor to be repositioned to block F.R.'s view of defendant.

Although *Williams* involved an adult witness with a debilitating level of emotional trauma, we do not view *Williams* as setting a minimum standard or threshold showing of trauma that must be made before the trial court may approve an alternative to face-to-face confrontation. (See *Lujan*, *supra*, 211 Cal.App.4th at pp. 1505-1508.) Not all cases will require testimony from a psychotherapist or other health care professional that the witness will suffer *extreme or debilitating* emotional trauma if required to testify facing the defendant. In some cases, like this one, the court may accurately assess the degree of the witness's emotional trauma without third party testimony or a pretrial hearing.[6]

---

[6] Testimony by closed-circuit television, which is statutorily allowed for child molestation victims age 13 years or younger and adults or children with a disability, require the court to find the witness is unavailable to testify unless the closed-circuit television procedure is used. (§§ 1347, 1347.5.)

In this case, F.R. showed up at trial to testify in the presence of the jury and defendant, but the trial court found and the record shows that F.R. was unable to proceed unless she could testify without having to see defendant. Given the state's important interest in obtaining F.R.'s testimony (*Sharp*, *supra*, 29 Cal.App.4th at p. 1783) and the need to balance that important interest against defendant's right to face-to-face confrontation, the trial court permissibly accommodated F.R.—with the most minimal intrusion possible on defendant's confrontation rights—by allowing the computer monitor to be repositioned to block F.R.'s view of defendant and his view of her.

In our view, the repositioning of the computer monitor in this case was certainly no more intrusive, and was even far less intrusive, on defendant's face-to-face confrontation rights than allowing F.R. to testify facing away from defendant would have been. As discussed, the courts in *Sharp* and *Gonzales* approved allowing the child witnesses in those cases to testify with their faces turned away from the defendants—in the case of *Gonzales*, *facing completely away*—as permissible infringements on the defendants' confrontation rights. (*Gonzales*, *supra*, 54 Cal.4th at p. 1265; *Sharp*, *supra*, 29 Cal.App.4th at p. 1783.)

When a witness testifies facing away from the defendant, the defendant's view of the witness's face and demeanor are largely, if not entirely, blocked, as defendant's view of F.R. was here. In addition, the witness chair and the podium for questioning are placed in unusual positions, making the alternative seating arrangement obvious to the jury. In this case, the repositioning of the computer monitor was never pointed out to the

42

jury, and it is likely that the jury did not notice that the monitor was blocking F.R.'s view

of defendant as she testified, or his view of her. Raising the monitor by only a few inches

was, in our view, far less intrusive than any other alternative procedure would have

been.[7]

The repositioning of the monitor was also far less intrusive than a one-way screen

or any other *obvious* physical barrier would have been.[8] Testimony by videotape

---

[7] Significantly, defense counsel did not ask the trial court to instruct the jury to disregard the placement of the computer monitor for F.R.—likely because the jury may not have noticed it was blocking F.R.'s view of defendant, or his view of her, unless its placement was pointed out to the jury. Nor did defense counsel ask the court to approve a different alternative procedure than repositioning the monitor, such as allowing F.R. to testify facing away from defendant, as in *Sharp* and *Gonzales*, or allowing F.R. to testify outside the presence of defendant and the jury, either by videotape as in *Williams*, or by closed-circuit television as in *Craig*. Defense counsel had a tactical reason for not making any of these requests: Any of these alternatives would have *made it obvious* to the jury that F.R. was testifying without looking at defendant.

Upon request, a defendant should be entitled to an instruction requiring the jury to disregard any alternative seating arrangement or similar device. (See, e.g., *Murphy*, *supra*, 107 Cal.App.4th at pp. 1152-1153 [instructing jury to disregard use of one-way glass or "plastic window device"].) But in some cases, it may be tactically advisable not to request such an instruction that draws attention to the alternative procedure. In other cases, the defense may reasonably determine it is tactically advisable to point out the alternative arrangement to the jury by arguing that the witness's credibility should be doubted because the witness was not "looking" the defendant "in the eye" while testifying. (*Coy*, *supra*, 487 U.S. at pp. 1018-1019.) As *Coy* observed, the trier of fact is free to draw its own conclusion about the credibility of a witness who does not "fix his eyes" upon the defendant but "studiously" looks elsewhere. (*Id*. at p. 1019.)

[8] In the wake of *Coy* and *Craig*, courts in other jurisdictions have disapproved the placement of an opaque or physical barrier between the defendant and the witness as violating the defendant's face-to-face confrontation rights under *Coy*. (See, e.g., *People v. Lofton* (Ill. 2000) 740 N.E.2d 782 [disapproving placement of two podiums blocking the witness's and the defendant's views of each other]; *People v. Mosley* (Colo. Ct.App. 2007) 167 P.3d 157 [disapproving placement of easel]; cf. *Fusion v. Tilton* (S.D.Cal., Sept. 10, 2007, No. 06-CV-0424 H) 2007 U.S. Dist.Lexis 66977 [approving child

(*Williams*, *supra*, 102 Cal.App.4th at pp. 1006-1007) or by closed-circuit television (*Craig*, *supra*, 497 U.S. at pp. 852-856) are drastic and extremely intrusive alternatives to face-to-face confrontation, because they do not involve live, in-court testimony. (See also § 1347 [allowing certain child molestation victims age 13 and younger to testify by closed-circuit television, based on compelling evidence shown by pretrial motion]; § 1347.5 [allowing adults and children with disabilities to testify by closed-circuit television under same evidentiary standard and procedure].)

When a witness is allowed to testify by videotape or closed-circuit television, the witness is not giving live, in-court testimony, in the presence of the jury or the defendant. Here, F.R. testified in court, in the presence of the jury and defendant, and defendant could hear her answers and contemporaneously assist his counsel in cross-examining her. In these circumstances, repositioning the computer monitor was, as the trial court described it, "at best . . . a small infringement" on defendant's confrontation rights—even though it blocked defendant's entire view of F.R. As *Craig* emphasized, "[t]he *central* concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary

---

testifying with her hand blocking her face as not involving use of a "physical barrier"].) *Coy* noted it was "difficult to imagine *a more obvious* or damaging violation of the defendant's right to a face-to-face encounter" than the one-way screen. (*Coy*, *supra*, 487 U.S. at pp. 1014-1015, 1020, italics added.) But *Coy* predates *Craig*, which allows for exceptions to face-to-face confrontation. (*Craig*, *supra*, 497 U.S. at pp. 844, 853-856.) And in this case, the computer monitor was not an *obvious* physical barrier. Rather, it was part of the normal courtroom setting.

proceeding before the trier of fact." (*Craig*, *supra*, 497 U.S. at p. 845, italics added.) This central concern of the confrontation clause was served here.

    4.  <u>Defendant Has Forfeited His Claim of Error Regarding A.J.R. and A.M.R.</u>

    Defendant claims his Sixth Amendment face-to-face confrontation rights were further violated when the computer monitor was raised while A.J.R. and A.M.R. testified after F.R. testified. The People argue defendant has forfeited this claim because he did not object when the monitor was raised, or left raised, when A.J.R. and A.M.R. testified. We agree with the People. Though defense counsel objected on face-to-face confrontation grounds when the monitor was raised for F.R.,[9] he did not object when it was raised for either of the two younger girls, A.J.R. or A.M.R. Defendant thus failed to preserve his claim of Sixth Amendment error regarding the trial testimony of A.J.R. and A.M.R. (See *People v. Alvarez* (1996) 14 Cal.4th 155, 186 [Sixth Amendment claim forfeited on appeal by failure to raise timely and specific objection below].)

    Defendant argues his failure to object when the monitor was raised for A.J.R. and A.M.R. should be excused because it would have been futile, given that the trial court overruled his objection to raising the monitor for F.R. (*People v. Boyette* (2002) 29 Cal.4th 381, 432.) We disagree. A.J.R. and A.M.R. were different witnesses than F.R.

---

    **9** The People mistakenly claim that defense counsel did not object to the computer monitor being raised for F.R. until *after* F.R. testified. The record shows defense counsel placed on the record his objection to the monitor being raised for F.R. during the recess the court took at 11:53 a.m., around 48 minutes after F.R. began testifying at 11:05 a.m., and the computer was raised to block her view of defendant. For this reason, we have considered defendant's confrontation claim regarding F.R. preserved for appeal.

The trial court overruled the objection to raising the monitor for F.R. based solely on F.R.'s upset emotional state and her inability to proceed when she first stepped to the witness stand, and her apparent anxiety for having to face defendant and testify against him. Nothing in the record indicates that the trial court would have overruled separate and specific objections to raising the monitor for either A.J.R. or A.M.R., simply because it overruled the objection to raising the monitor for F.R. (*Ibid*.)

    5.  <u>Defendant Has Not Shown Ineffective Assistance of Counsel</u>

Defendant alternatively claims his defense counsel rendered ineffective assistance in failing to object to raising the monitor for A.J.R. or A.M.R. To establish a claim of ineffective assistance of counsel, a defendant must show (1) his counsel's representation failed to meet an objective standard of professional reasonableness, and (2) he was prejudiced by his counsel's deficient representation, that is, absent the deficiency there is a reasonable probability the result at trial would have been more favorable to the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688; *People v. Frye* (1998) 18 Cal.4th 894, 979.) There is a strong presumption that counsel's conduct falls within the wide range of professional reasonableness, and great deference is given to counsel's tactical decisions. (*Strickland v. Washington*, *supra*, at p. 688; *People v. Frye*, *supra*, at p. 979.) On appeal, a conviction may not be reversed based on ineffective assistance of counsel unless the record affirmatively shows there was no rational tactical purpose for counsel's act or omission. (*People v. Frye*, *supra*, at pp. 979-980.)

Defendant has not shown his trial counsel's performance was deficient because he did not object to raising the computer monitor, or leaving the monitor raised, when A.J.R. and A.M.R. testified. The record shows counsel had a rational, tactical purpose for not raising such objections: Even with the computer monitor raised, F.R. was emotional when she testified. Because A.J.R. (age 14) and A.M.R. (age 13) were several years younger than F.R. (age 18), defense counsel could have reasonably believed that allowing the monitor to be raised for A.J.R. or A.M.R. would prevent any emotional displays by *them* while they testified, and would thus minimize any juror sympathy for all of the girls.[10]

B. *The Trial Court Did Not Abuse Its Discretion in Excusing a Juror Who Claimed He Was Unable to Attend the Trial Due to Food Poisoning*

At the beginning of the second day of trial, June 16, 2015, before M.C. had finished testifying, the trial court advised the parties that Juror No. 12 had called the clerk to say he would not be present because he had "food poisoning." The trial court said, "[n]ormally at this stage of the case I'd be reluctant to excuse one of the seated jurors," but, "I'm inclined to go forward" "given our status and our time estimates," and because

---

**10** The People argue defendant cannot show his counsel was deficient in failing to object when the monitor was raised for A.J.R. and A.M.R. because the record does not show defendant was unable to see A.J.R. or A.M.R. as they testified, given that the girls were "different witnesses with different heights." This argument is unfounded. There is no indication that either A.J.R. or A.M.R. were taller or shorter than F.R. Moreover, and as noted, before closing arguments the prosecutor clarified that the computer monitor was raised while A.J.R. and A.M.R. testified. The only ostensible purpose in raising the monitor for any of the girls was to prevent them from having to see defendant while they testified against him.

there were three alternate jurors. Defense counsel said he was "hesitant" to proceed without Juror No. 12, "on something that is relatively temporary in nature." The prosecutor said the case might not be completed within the time estimate if the case did not proceed that day, and the prosecutor and the court recalled that Juror No. 3 was "moving to Indiana on the 25th." The court overruled defense counsel's objection. It excused Juror No. 12 and chose alternate Juror No. 2 at random from the three alternates to replace Juror No. 12.

Defendant claims the trial court erroneously excused Juror No. 12, "[g]iven the lack of any timeframe for when [Juror No. 12] could return," and observes that Juror No. 12 may have only been ill and absent from trial for a few hours, for all the court or anyone knew when the juror was excused. We reject this claim and conclude Juror No. 12 was properly excused upon a showing of good cause.

"Trial courts may remove any juror who 'becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty . . . .' (§ 1089.)"[11] (*People v. Duff* (2014) 58 Cal.4th 527, 560.) Although a trial court "'has an affirmative obligation to investigate'" asserted grounds to dismiss a juror, "'[b]oth the scope of any investigation and the ultimate decision whether to discharge a given juror are committed

_____

[11] Section 1089 states, in pertinent part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box . . . ."

to the sound discretion of the trial court.' [Citations.]" (*Ibid.*; *People v. Fuiava* (2012) 53 Cal.4th 622, 711.) On appeal, the trial court's decision to remove a juror is reviewed under the "'demonstrable reality test.'" (*People v. Fuiava*, *supra*, at pp. 711-712.) Under that test, we ask whether "the record establish[es] the actual basis for the trial court's decision. So long as it does, we ask only whether the evidence relied upon was sufficient to support that basis as grounds for dismissal; we do not independently reweigh the evidence or demand more compelling proof than that which could satisfy a reasonable jurist." (*People v. Duff*, *supra*, at p. 560; *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052-1053.)

Here, the record establishes that the actual basis of the trial court's excusal of Juror No. 12 was the juror's representation in a phone call to the clerk that he had food poisoning and was unable to attend the trial on June 16, 2015—or for at least part of June 16 and possibly for additional days. On this basis, the trial court reasonably excused Juror No. 12 rather than delay the trial for any period of time or ascertain how long Juror No. 12 expected he would be ill. As indicated, the record shows and defendant does not dispute that another juror was moving out of state on June 25, that any delay in the trial may have prevented the case from being completed within the time estimate, and three alternate jurors were available.

Defendant argues the trial court had an obligation to *personally* question Juror No. 12 to determine how long he expected to be ill and unable to attend trial, and notes the juror's absence "could have been mere hours." We disagree that the trial judge had an

49

obligation to personally question the juror or further investigate the matter.  As our state high court has observed, "[t]he demonstrable reality test does not demand of trial judges confronted with sick jurors that they elicit conclusive proof of the length of future incapacitation . . . . Nor does it demand that incapacitation exceed some preset length; in the right circumstances, an absence of a day or less may warrant excusal.  [Citations.]" (*People v. Duff*, *supra*, 58 Cal.4th at pp. 560-561 & fn. 15.)

C.  *The Prosecution Was Properly Allowed to Impeach Defendant's Character Witnesses with Evidence Defendant Had a Prior Lewd Act Conviction (§ 288, subd. (a)); Alternatively, Any Error Was Harmless*

Defendant claims the trial court erroneously allowed the prosecution to present, as "rebuttal character evidence" in violation of Evidence Code sections 1101, 1102, and 352, evidence that defendant had a prior conviction for committing a lewd and lascivious act on a child under age 14.  (Pen. Code, § 288, subd. (a).)  We conclude that the prosecutor was properly allowed to use the prior conviction *to impeach* the good character testimony of C.H. and Mrs. A.  No substantive evidence of the prior conviction was admitted.  Alternatively, any error in allowing the prior conviction to be used for impeachment purposes was harmless.

1.  Relevant Background

(a)  *Defendant's Friend C.H.*

As set forth above, C.H., defendant's friend of 35 years, testified for the defense that all of the girls seemed normal around defendant and that defendant was often

50

traveling for work and absent from the Olive Street house. At the conclusion of his direct examination, defense counsel asked C.H.: "Did you have any hesitation trusting [defendant] around your child?" C.H. responded he had no hesitation trusting defendant around his 13-year-old son.

At a reported sidebar conference, the prosecutor asked the court for permission to ask C.H. whether his opinion about trusting defendant around C.H.'s child would change if C.H. knew defendant had a prior conviction for violating section 288, subdivision (a). The prosecutor argued defense counsel had "opened that door" to allowing her to impeach C.H. by asking him that question. Over defense counsel's objection, the trial court agreed with the prosecutor, saying: "The problem is the last question. I felt the other questions were fine because they dealt mostly with just observations and what [C.H. had] seen and heard. But the very last question when you asked him about any hesitation to allow your son around [defendant] I think that does open the door to [the prosecutor] *asking that question*." (Italics added.)

On cross-examination, the prosecutor asked C.H. whether his opinion that he would trust defendant around his son would change if he knew defendant had been convicted of committing a lewd or lascivious act with a child under age 14. C.H. initially responded by saying: "I'd need the real story. No, I would not." The following colloquy ensued:

"[PROSECUTOR:] If you knew the real story?

51

"[C.H.:] Well, if it was a mutual agreement. Whatever happened in his past happened in his past. But if it was a mutual agreement as a kid, no. They were kids. Everyone knows that. Not everyone, but . . . .

"[PROSECUTOR:] How about if [defendant] was 20 years old when he was touching someone under the age of 14?

"[C.H.:] Well, I'd consider that wrong.

"[PROSECUTOR:] Would that change your opinion as to whether or not you trusted your son around [defendant]?

"[C.H.:] Well, if I had a kid back then. I mean, now, yeah. But I didn't have a kid back then so I can't honestly answer that.

"[PROSECUTOR:] Well, you said that you trust your son around . . . .

"[C.H.:] I do

"[PROSECUTOR:] And now knowing . . . .

"[C.H.:] I believe he didn't do nothing wrong. [¶] . . . [¶]

"[PROSECUTOR:] In the past you don't believe [defendant's] done anything wrong?

"[C.H.:] I—no, I have not. Not as far at that conviction, no. I don't know the story on it. I never got the full story on it.

"[PROSECUTOR:] And in fact, you were upset with [defendant] because he didn't tell you about his first . . . .

"[C.H.:] I would, yes."

52

C.H. was later recalled by the defense to testify that the garage door at the Olive Street house could only be opened and shut from the outside, and that C.H. did not recall seeing a sofa in the garage.

On further cross-examination, the prosecutor returned to the issue of defendant's prior conviction:

"[PROSECUTOR:]  Yesterday you had told us about trusting [defendant].  Would it change your opinion as to whether you trust [defendant] around you son if you knew that on November 20, 1998 . . . .  [¶]  . . .  [¶]  . . . he admitted by pleading guilty to lewd and lascivious act with a child under 14 years that occurred between September 1st of 1996 and November 31st of 1996?

"[C.H.:]  If I was aware of the actual real story, yes, I would not change my opinion.

"[PROSECUTOR:]  It would not change your opinion?

"[C.H.:]  No.  I'd still trust him."

      (b)  *Defendant's Mother, Mrs. A.*

At the conclusion of her testimony for the defense, defendant's mother, Mrs. A., acknowledged that defendant had "problems in the past," but claimed he had "grown to be a very good man," and he was responsible, caring, trustful, and loving toward his family.  On cross-examination, Mrs. A. acknowledged that defendant had a prior

conviction for committing lewd and lascivious acts with a child under 14 years old, but she claimed he had changed since then.[12]

2.  The Prior Conviction Was Properly Used for Impeachment Purposes Only

Defendant argues his prior Penal Code section 288, subdivision (a) conviction was erroneously admitted as "rebuttal character evidence" under Evidence Code sections 1101, 1102, and 352.  As the People point out, however, the prior conviction was not admitted as substantive evidence, including as rebuttal character evidence under Evidence Code section 1102.  Rather, the prosecutor was properly allowed to impeach the testimony of C.H. and defendant's mother that defendant was a person of good character, who was unlikely to molest children, by asking them whether they knew of the prior conviction, and if so, whether it would change their opinions of defendant as a person who was unlikely to molest children.

"[E]vidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."  (Evid. Code, § 1101, subd. (a).)  Thus, "[i]n criminal cases, the prosecution is prohibited from introducing evidence of a defendant's bad character or reputation in

_____

**12**  Though defense counsel did not object when defendant's prior conviction was used to impeach the good character testimony of Mrs. A., we assume without deciding that defendant has preserved for appeal all of his claims of evidentiary error regarding the prosecution's use of the prior conviction.

order to prove he or she acted in conformity with that character in committing the charged offense." (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 357.)

"By contrast, a defendant may introduce 'evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation' in order to 'prove his conduct in conformity with such character or trait of character.' (Evid. Code, § 1102, subd. (a).) However, '[w]hen a criminal defendant presents opinion or reputation evidence on his own behalf the prosecutor may present *like evidence* to rebut the defendant's evidence and show a likelihood of guilt. (Evid. Code, § 1102, subd. (b).)'" (*People v. Tuggles*, *supra*, 179 Cal.App.4th at p. 357, italics added.)

Under Evidence Code sections 1101, subdivision (a) and 1102, subdivision (b), evidence of specific acts of a criminal defendant's misconduct is inadmissible to prove the defendant's character or a trait of his character. "As the Law Revision Commission's comments to section 1102 make clear, evidence of specific acts of the accused are, as a general rule, inadmissible to prove his disposition to commit such acts (see also Evid. Code, § 1101); this general rule is applicable 'even though the defendant has opened the question by introducing evidence of his good character.'" (*People v. Wagner* (1975) 13 Cal.3d 612, 619; *People v. Felix* (1999) 70 Cal.App.4th 426, 432-433.)

The rules precluding the admission into evidence of specific acts of misconduct under Evidence Code sections 1101 and 1102 "must, of course, be distinguished from the cross-examination of a *reputation* [or character] *witness*. When a defense witness, other than the defendant himself, has testified to the reputation of the accused, the prosecution

may inquire of the witness whether he has heard of acts or conduct by the defendant inconsistent with the witness' testimony. [Citations.]" (*People v. Wagner*, *supra*, 13 Cal.3d at p. 619.) Here, no evidence of defendant's prior conviction was admitted as "rebuttal character evidence"—that is, to prove defendant had a character trait or propensity to molest children. Instead, the prosecutor was properly allowed to use the prior conviction to impeach the testimony of C.H. and Mrs. A. that defendant was a person of good character, unlikely to molest children. (*People v. Marsh* (1985) 175 Cal.App.3d 987, 992-993.)

*Marsh* is instructive. The defendant in *Marsh* was tried for the murder of his girlfriend's young son. (*People v. Marsh*, *supra*, 175 Cal.App.3d at pp. 990-991.) *Marsh* held that the prosecutor was properly allowed to impeach the defendant's character witnesses who testified the defendant was "'very kind, loving, gentle, and patient with children,'" by asking the witnesses whether they were aware the defendant had a prior robbery conviction. As *Marsh* explained, the character witnesses testified the defendant had a character trait for nonviolence, and the robbery was "an assaultive-type crime directly relevant" to that character trait. (*Id*. at p. 992.)

Similarly here, C.H. testified he would trust defendant around his 13-year-old son, and Mrs. A. testified defendant had grown to be a good person who was trustworthy and loving toward his family. In both instances, this testimony was akin to opining defendant was a person of good character who was unlikely to molest children. That defendant had a prior conviction for violating section 288, subdivision (a) was directly relevant to

whether he possessed this character trait. Thus there was no error in allowing the prosecutor to ask both C.H. and Mrs. A. whether they knew of the prior conviction and, if so, whether it changed their opinions of defendant's good character. (*People v. Marsh*, *supra*, 175 Cal.App.3d at p. 992.)

3. Any Error Was Harmless

Even if defendant's prior section 288, subdivision (a) conviction was erroneously placed before the jury, the error was harmless. The *Watson* standard of review applicable to claims of state law error applies, and there is no reasonable probability defendant would have realized a more favorable result—including a hung jury on any of the charges—had the jury not heard of his prior conviction. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Felix*, *supra*, 70 Cal.App.4th at p. 432.)[13]

Six female witnesses, M.C., F.R., A.J.R., A.M.R., C.B., and R.G., each testified that defendant repeatedly molested them when they were young girls. Although defense counsel argued that the molestation claims of the four younger girls were uncorroborated—and fabricated, because the girls had always disliked him—there was no

---

[13] Defendant argues the use of his prior conviction violated his federal constitutional rights to due process and a fair trial, and for that reason the error must be, but is not, harmless beyond a reasonable doubt under the *Chapman* standard of review. (*Chapman v. California* (1967) 386 U.S. 18, 24.) We disagree. Defendant's "attempt to inflate garden-variety evidentiary questions into constitutional ones is unpersuasive." (*People v. Boyette*, *supra*, 29 Cal.4th at p. 427.) "'[A]pplication of the ordinary rules of evidence generally does not impermissibly infringe on a capital defendant's constitutional rights'" (*People v. Prince* (2007) 40 Cal.4th 1179, 1229), and this case presents no exception. Thus, any error must be and is harmless under the *Watson* standard of state law error. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

indication that C.B. or R.G. had conspired to fabricate any of the girls' molestation claims. As such, the testimony of C.B. and R.G. lent much credibility to the girls' claims. The testimony of all six of these witnesses was also very detailed and overshadowed the prosecutor's relatively brief references to defendant's prior conviction during her cross-examination of C.H. and Mrs. A.

It is also likely that the jury believed defendant's 1998 lewd act conviction was based on his apparent rape and molestations of C.B., given that C.B. testified defendant forced himself on her in his father's bathroom around 1996, when C.B. was 13 years old. While cross-examining C.H., the prosecutor mentioned that defendant pled guilty to committing a lewd and lascivious act on a child under age 14, on November 20, 1998, based on conduct that occurred between September 1 and November 31, 1996. Thus, it is highly unlikely that the prosecutor's references to defendant's 1998 lewd act conviction affected any of the jury's guilty verdicts or true findings regarding defendant's more recent conduct against M.C., F.R., A.J.R., and A.M.R.

D. *CALCRIM No. 350 Was Not Required to Be Given Sua Sponte, and Defendant Has Not Shown He Was Prejudiced By His Counsel's Failure to Request the Instruction*

Defendant claims the trial court erroneously failed to instruct the jury sua sponte with CALCRIM No. 350, regarding the use of C.H.'s and Mrs. A.'s character

testimony.**14** Alternatively, defendant claims his defense counsel rendered ineffective assistance in failing to request the instruction.

Upon request, a defendant is entitled to an instruction that opinion or reputation evidence of the defendant's good character traits, when offered to prove the defendant acted in conformity with that trait, may be sufficient to create reasonable doubt of the defendant's guilt. (*People v. Bell* (1875) 49 Cal. 485, 488-490 [jury should be instructed that evidence of good reputation may be sufficient to create reasonable doubt of guilt]; see also *People v. Jones* (1954) 42 Cal.2d 219, 224 [good character evidence may create reasonable doubt of guilt].) No such instructions are required to be given in the absence of a request, however. (Bench Notes to CALCRIM No. 350, citing *People v. Bell*, *supra*, at pp. 489-490.) Thus, the trial court did not err in failing to give CALCRIM No. 350 or similar instructions sua sponte. Indeed, defendant concedes "it does not appear that the instruction is [required to be given] sua sponte."

---

**14** CALCRIM No. 350 states: "You have heard character testimony that the defendant (is a _____ *<insert character trait relevant to crime[s] committed>* person/ [or] has a good reputation for _____ *<insert character trait relevant to crime[s] committed>* in the community where (he/she) lives or works). [¶] Evidence of the defendant's character for _____ *<insert character trait relevant to crime[s] committed>* can by itself create a reasonable doubt [whether the defendant committed _____ *<insert name[s] of alleged offense[s] and count[s], e.g., battery, as charged in Count 1>*]. However, evidence of the defendant's good character may be countered by evidence of (his/her) bad character for the same trait. You must decide the meaning and importance of the character evidence. [¶] [If the defendant's character for certain traits has not been discussed among those who know (him/her), you may assume that (his/her) character for those traits is good.] [¶] You may take that testimony into consideration along with all the other evidence in deciding whether the People have proved that the defendant is guilty beyond a reasonable doubt."

59

There is no need to address whether defense counsel's performance was deficient in failing to request CALCRIM No. 350, because defendant has not shown he was prejudiced by his counsel's failure to request the instruction. As discussed above, to establish a claim of ineffective assistance of counsel, a defendant must show (1) his counsel's representation failed to meet an objective standard of professional reasonableness, and (2) he was prejudiced by his counsel's deficient representation, i.e., absent the deficiency, there is a reasonable probability the result at trial would have been more favorable to the defendant. (*Strickland v. Washington*, *supra*, 466 U.S. at pp. 687-688; *People v. Frye*, *supra*, 18 Cal.4th at p. 979.)

There is no reasonable probability defendant would have realized a more favorable result had CALCRIM No. 350 or a similar instruction been given. Such an instruction would have told the jury it could use the good character testimony of C.H. and Mrs. A. to conclude there was a reasonable doubt defendant committed the charged offenses. But this point was plainly suggested by the character evidence itself. Together, C.H. and Mrs. A testified that defendant was a good person—trustworthy and loving toward his family—and was not the kind of person who would molest young girls—at least not at his current age and given how much he had matured since his prior lewd act conviction many years earlier.

Additionally, the good character evidence was overshadowed by the testimony of M.C., F.R., A.J.R., and A.M.R. that defendant repeatedly molested them over a period of several years, and in the case of M.C. and F.R., as recently as July 2013. The testimony

60

of C.B. and R.G. that defendant molested them when they were young girls also lent much credibility to the testimony of M.C., F.R., A.J.R., and A.M.R. and refuted the defense's claim that the girls had fabricated the charges because they disliked defendant.[15]

E. *The Admission Into Evidence of People's Exhibit 50, Showing Defendant's Work Travel Schedule, Was Harmless*

Defendant claims the trial court erroneously admitted a one-page document (People's exh. 50) showing defendant's work travel schedule, over defense counsel's objection that the document was hearsay. Defendant also claims that insufficient foundation was laid for the admission of the document. We conclude that any error in admitting the document was not prejudicial to defendant.

1. Relevant Background

Mrs. A. testified on direct examination that defendant was absent from the Olive Street house 85 to 90 percent of the time because he worked long days and often traveled away from home for his employer. Defendant traveled to Singapore, Texas, North Carolina, and South Carolina for his company.

On cross-examination, Mrs. A. admitted she obtained defendant's work travel records from his employer to aid in his defense. She had testified about his work

---

[15] We also reject defendant's claim the failure to give CALCRIM No. 350 "removed in part [his] defense from the jury's consideration" and, as such, constituted "structural error warranting per se reversal." The failure to instruct on the use of the good character evidence by no means prevented the jury from considering the evidence, and all of the authorities defendant cites to support this claim are inapposite.

61

schedule from her memory, however. She believed he began traveling for GM

Enterprises around late 2011, just before the family moved into the Olive Street house.

After they moved into that house, defendant would be at home for one or two weeks at a

time. When asked whether defendant did not begin traveling for GM Enterprises until

April 27, 2012, Mrs. A. answered: "Yeah. As I said specifically, before, I wasn't real

certain as far as dates went. But yes, probably."

Next, the prosecutor asked whether Mrs. A.'s memory of when defendant was

traveling would be refreshed if she looked at a page of his work travel records (marked as

People's exh. 50) (the document). After the trial court overruled defense counsel's

hearsay objection to the document, Mrs. A. answered, "I suppose, yes." She "somewhat"

recognized the document and said it showed most but not all of the places defendant

traveled; it did not show he had traveled to North Carolina. When specifically asked

whether the document showed the specific dates defendant traveled, Mrs. A. again

answered that she did not recall the specific dates, but said the document "[p]robably"

refreshed her recollection as to the dates defendant traveled. At that point, the trial court

allowed the prosecutor to publish the document to the jury, over defense counsel's

renewed hearsay objection. Shortly thereafter, the trial court admitted the document into

evidence.

2. Analysis

Defendant claims the document was erroneously admitted over his hearsay

objection, because "[c]ertainly" Mrs. A. "could not authenticate it since she neither made

62

it nor knew if it was correct.  In fact she thought it was not correct."[16]  Defendant observes that the prosecutor used the document for its truth in her closing argument by pointing to it as proof that defendant was home, and not traveling, on July 26, 2013, "the date [M.C.] said she was molested."  More broadly, defendant argues that the admission of the document "effectively undercut . . . [his] defense[], that he was away most of the time on work and therefore could not have committed the number of molestations alleged" by the girls.

As indicated, it is unnecessary to address this claim of evidentiary error because the admission of the document, if error, was harmless, state law error.  (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)  The document is titled "GM Enterprises  [¶]  Jason Arredondo's travel records  [¶]  Prepared May 20, 2014," and lists a vertical column of date ranges followed by a vertical column locations.  For example, the first listed date range is "4/27/2012-5/11/2012," followed by "San Marcos, TX," indicating defendant was not at home and was working in San Marcos, Texas on those dates.  Likewise, the document shows defendant was in San Marcos, Texas from July 29, 2013 to August 2, 2013.  Thus, as the prosecutor argued, the document showed defendant was not traveling on July 26, 2013, the date M.C. testified defendant massaged both her and F.R.'s buttocks as they lay on their stomachs, talking on their phones.

---

[16] The People claim defendant has forfeited any claim of error regarding the admission of the document (exh. 50) because he did not object when it was offered into evidence.  We assume defendant preserved this evidentiary claim for appeal.

63

The document did not substantially assist the prosecution, however. Though the prosecutor used the document to show defendant was at home when M.C. claimed the "butt massage" incident occurred on July 26, 2013, M.C. was certain the "butt massage" incident occurred on that date, because she recalled she was struck by a car that night and hospitalized after attending a movie with F.R.

Nor did the document substantially undercut defendant's claim he was not at home when the girls claimed he molested them. Even if the document did not, as defendant argues, show all of the dates and places he traveled for his employer, GM Enterprises, defendant offered no specific evidence that he was absent from the Olive Street house on any specific dates or times. C.H. and defendant's mother only generally testified defendant was often away from home working. But defendant's mother also recalled that defendant was often home for a week or two at a time, and admitted that April 27, 2012 was "probably" the first date defendant traveled for work. Other than July 26, 2013, the date M.C. was certain "the butt massage" incident occurred, none of the girls testified defendant molested them on specific dates. If anything, the document assisted the defense by showing that defendant often traveled for work between April 2012 and August 2013.

F. *There Was No Cumulative Prejudicial Error*

Defendant claims the judgment must be reversed because the cumulative effect of the trial errors and his counsel's errors deprived him of a fair trial. (*People v. Guerrero* (1976) 16 Cal.3d 719, 730.) There was no cumulative prejudicial error.

64

We have identified three errors or potential errors: (1) defense counsel's failure to request CALCRIM No. 350, or another instruction, advising the jury it could use the good character testimony of C.H. and Mrs. A. to conclude there was a reasonable doubt defendant committed the charged crimes; (2) allowing the prosecution to use defendant's prior section 288, subdivision (a) conviction to impeach the good character testimony of C.H. and Mrs. A.; and (3) the admission of defendant's one-page work travel schedule into evidence.

Whether considered individually or cumulatively, none of these errors or potential errors warrants reversal. Even if CALCRIM No. 350 had been given, and even if the jury had not heard of defendant's prior conviction or seen his work travel schedule, there is no reasonable probability *or even a reasonable possibility* that defendant would have realized a more favorable result. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836; *Chapman v. California*, *supra*, 386 U.S. at p. 24.) Absent all three of the errors or potential errors, the jury would have heard the testimony of the four girls, M.C., F.R., A.J.R., and A.M.R., that defendant repeatedly molested them, together with the independent testimony of C.B. and R.G., that defendant similarly molested them when they were young girls. It is also highly likely, and even virtually certain, that the jury believed the 1998 prior conviction was based on defendant's molestations of C.B. The jury heard the prior conviction was based on conduct occurring in late 1996, the approximate time C.B. testified that defendant forced himself on her in the bathroom. This neutralized any prejudicial effect of the prior conviction.

Furthermore, in view the overwhelming strength of the prosecution's case, there is no reasonable possibility that CALCRIM No. 350 would have assisted defendant. Given the testimony of the prosecution's six female alleged molestation victim-witnesses, we do not believe the jury could have believed defendant was a person of good character, unlikely to molest children, as his character witnesses testified. Lastly, and as discussed, the admission of defendant's work travel schedule did not substantially assist the prosecution, and if anything, assisted defendant because it showed he was often away from home, at least between April 2012 and August 2013.

G. *The Matter Must Be Remanded for Resentencing on Counts 1, 12, and 14*

Defendant claims he was erroneously sentenced to full consecutive sentences on counts 1, 12, and 14, rather than one-third of the middle term on those counts. The People concede the error. The parties request, and we agree, that the matter must be remanded for resentencing on counts 1, 12, and 14.

Defendant was sentenced to 33 years plus 275 years to life. The indeterminate term consists of 11 consecutive 25-year-to-life terms on the lewd act convictions in counts 2 through 11, and 13. (§§ 288, subd. (a), 667.61, 667.71.) In calculating the 33-year determinate term, the court deemed count 12 the principal count, sentenced defendant to the middle term of six years on count 12, doubled to 12 years based on the strike prior, plus a six-year consecutive term on count 14, doubled to 12 years, plus a two-year consecutive term on count 1, doubled to four years—for a total of 28 years on

counts 1, 12, and 14, plus five years for the serious felony prior, the February 2, 1999 lewd act conviction.  (§§ 667, subd. (a), 1192.7, subd. (c)(6), 288, subd. (a).)

At sentencing, the prosecutor claimed that *full* consecutive terms, rather than one-third middle terms, or concurrent terms, were *required* to be imposed on counts 1, 12, and 14 pursuant to section 667.61, subdivision (i).  The trial court agreed.  The parties now agree that the prosecutor and trial court were mistaken.

We agree that section 667.61, subdivision (i) did not require the court to impose consecutive terms on counts 1, 12, and 14.  Section 667.61 subdivision (i) provides that, for any offense specified in section 667.61, subdivision (c)(1) through (7), or in section 667.61, subdivision (n)(1) through (6), "the court shall impose *a consecutive sentence* for each offense that results in a conviction under this section if the crimes involve separate victims or involve the same victim on separate occasions" as defined in section 667.6, subdivision (d).  (Italics added.)  In count 1, defendant was convicted of violating section 288, subdivision (c)(1) (lewd act on child under age 16), in count 12 of violating section 288a, subdivision (c)(1) (oral copulation with a child under age 14), and in count 14 of violating section 289, subdivision (j) (sexual penetration with a child under age 14).  None of these offenses are listed in section 667.61, subdivision (c)(1) through (7) or section 667.61, subdivision (n)(1) through (6).

Additionally, section 667.6, subdivision (d) states, in part:  "A full, separate, and consecutive term shall be imposed for each violation of an offense specified in subdivision (e) . . . ."  The People further concede, and we agree, that the convictions in

67

counts 1, 12, and 14 are not listed in section 667.6, subdivision (e).  Thus, "full separate and consecutive terms" were not *required* to be imposed on counts 1, 12, and 14 under section 667.6, subdivision (d).

Nonetheless, the "Three Strikes" law applies to defendant's convictions in counts 1, 12, and 14, because defendant has a prior strike conviction.  (§ 667, subds. (b)-(i).)  Remand is necessary so the court may resentence defendant on counts 1, 12, and 14 after considering the applicability of the Three Strikes law to those counts.  (See *People v. Lua* (2017) 10 Cal.App.5th 1004, 1020-1021.)

On remand, the court must determine whether counts 1, 12, and 14 were "committed on the same occasion" or arose "from the same set of operative facts" as any of defendant's other current convictions.  (§ 667, subd. (c)(6).)  If the answer to either of these two questions is no for count 1, 12, *or* 14, then the court is required to impose a consecutive term on *that* count.  (*Ibid*.)  But if the answer to both questions is yes for count 1, 12, or 14, then the court has discretion to impose a concurrent term on that count.  (See Cal. Rules of Court, rule 4.425.)  Any term imposed on counts 1, 12, and 14 must be doubled based on defendant's prior strike conviction.  (§ 667, subd. (e)(1); *People v. Nguyen* (1999) 21 Cal.4th 197, 203.)

## IV.  DISPOSITION

The matter is remanded to the trial court with directions to resentence defendant on counts 1, 12, and 14.  In all other respects, the judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

FIELDS
J.

I concur:

RAMIREZ
P. J.

[*People v. Arredondo*, E064206]

SLOUGH, J., Dissenting and Concurring.

I respectfully disagree with the majority's conclusion the accommodation during F.R.'s testimony did not violate Arredondo's Sixth Amendment right to face-to-face confrontation. The majority opinion breaks with established Sixth Amendment law. It is the first California appellate decision to approve the use of a physical barrier accommodation, as well as the first to invade the right to face-to-face confrontation to protect a non-disabled adult witness. Potentially more problematic, the majority infers and upholds a finding of necessity based on the slightest evidence I have found in our case law.

The relevant facts from trial span a mere three and a half pages of transcript, from which we can glean only that the court allowed an 18-year-old witness—who already had a support person—to testify behind a monitor that entirely blocked defendant's view of her and vice versa. The court did so to make the witness "more comfortable" because she had become emotional when taking the stand. However, the court did not hear evidence from anyone—medical professionals, for example, or even simply the witness herself— as to the cause and degree of her distress, and the record does not support an implied finding the distress was severe enough to warrant such an invasive accommodation. As I will explain, the trial court's handling of this situation did not provide a sound basis for depriving Arredondo of his constitutional right.

A defendant's Sixth Amendment right to look his accuser in the face and have his accuser do the same originates from "something deep in human nature that regards face-to-face confrontation . . . as 'essential to a fair trial.'" (*Coy v. Iowa* (1988) 487 U.S. 1012, 1017 (*Coy*).) In *Coy*, the trial court permitted the use of a screen that allowed the defendant "dimly to perceive" the two 13-year-old witnesses and entirely blocked their view of him. The United States Supreme Court found the physical barrier unconstitutional, stating it was "difficult to imagine a more obvious or damaging violation of the defendant's right to a face-to-face encounter." (*Id.* at p. 1020.)

Two years later, in *Maryland v. Craig* (1990) 497 U.S. 836 (*Craig*), the Supreme Court created a narrow exception to the prohibition against accommodations eliminating face-to-face confrontation. The exception applies when the trial court has "hear[d] evidence" and made "a case-specific finding" that a *child witness* would be "traumatized" if made to confront the defendant face-to-face in court. (*Id.* at pp. 855-856, 858.) The emotional distress must be *severe*; anxiety or reluctance to testify is not enough. (*Ibid.*) Additionally, although the accommodation will eliminate *face-to-face* confrontation, it must otherwise assure the testimony is reliable by preserving the other aspects of confrontation, which include a defendant's ability to view a witness's demeanor as he or she testifies. (*Id.* at p. 851.) This aspect is crucial. The ability to view the witness's demeanor "not only permit[s] a defendant to 'confound and undo the false accuser, or reveal the child coached by a malevolent adult,' [citation], but may well aid a defendant in eliciting favorable testimony from the child witness." (*Ibid.*)

Accommodations upheld under *Craig* have ranged from a live closed-circuit television feed (where the defendant can watch the witness as she testifies and has real-time communication with counsel) to allowing the witness to sit angled to the side while on the stand and thus not face the defendant directly. On the spectrum of accommodations, placing an opaque, physical barrier between the defendant and witness is the most invasive to the face-to-face confrontation right. (*Craig*, *supra*, 497 U.S. at p. 851; *Coy*, *supra*, 487 U.S. at pp. 1019-1020.)

Before today, only one California decision has upheld the use of an accommodation eliminating a defendant's ability to observe witness demeanor, and that case involved a physically and mentally disabled witness who—*according to the testimony of medical professionals*—would become suicidal if made to face the defendant in court. (*People v. Williams* (2002) 102 Cal.App.4th 995 (*Williams*).) Here, the trial court opted for an opaque physical barrier without even attempting to ensure the adult witness truly required it, and the majority, remarkably, finds no constitutional violation. In no other case has a court upheld an accommodation as invasive as the one used here on the basis of such slight evidence of necessity.

Because I believe the record discloses a clear violation of Arredondo's face-to-face confrontation rights, and that violation was not harmless beyond a reasonable doubt, I would reverse the convictions on counts 3, 4, and 5—the counts for sexual assaults against F.R. However, because I concur with the majority's conclusions regarding the remainder of Arredondo's claims of error, I would otherwise affirm the judgment, leaving

3

Arredondo sentenced to 200 years to life (for counts 2, 6-11, 13) plus the determinate term the trial court imposes on remand (for counts 1, 12, 14).

A.      *The Sixth Amendment Right to Face-to-Face Confrontation*

In *Herbert v. Superior Court* (1981) 117 Cal.App.3d 661 (*Herbert*), the Third District held the trial court violated defendant's confrontation right when it moved his seat in the courtroom so he could not see the 5-year-old witness during her testimony and vice versa. (*Id.* at p. 665.) The trial court had allowed the accommodation based on its "conclu[sion] the child 'was disturbed by the number of people in the courtroom and in particular with the presence of the defendant.'" (*Id.* at p. 664.) The *Herbert* court held, "By allowing the child to testify against defendant without having to look at him or be looked at by him, the trial court not only denied defendant the right of confrontation but also foreclosed an effective method for determining veracity." (*Id.* at p. 668.) The court explained, "The historical concept of the right of confrontation has included the right to see one's accusers face-to-face, thereby giving the fact-finder the opportunity of weighing the demeanor of the accused when forced to make his or her accusation before the one person who knows if the witness is truthful." (*Id.* at p. 671.) In finding the accommodation unconstitutional, the court observed, "We have no specific record of the child's conduct which motivated the lower court to devise the seating arrangement in question. We have only the *subjective observations* of the court put into the record *to justify and explain the unorthodox courtroom arrangement*. We have no record of any intimidating action by the defendant." (*Id.* at p. 670, italics added.)

4

In *Coy*, the Supreme Court struck down an accommodation similar to—but still less invasive than—the one used here. The trial court had allowed a "screen to be placed between appellant and the witness stand during the [two 13-year-old] girls' testimony. After certain lighting adjustments in the courtroom, the screen would enable appellant dimly to perceive the witnesses, but the witnesses to see him not at all." (*Coy*, *supra*, 487 U.S. at pp. 1014-1015.) "The screen . . . was specifically designed to enable the complaining witnesses to avoid viewing appellant as they gave their testimony, and the record indicates that it was successful in this objective. *It is difficult to imagine a more obvious or damaging violation of the defendant's right to a face-to-face encounter*." (*Id.* at p. 1020, italics added.) Like the appellate court in *Herbert*, the Supreme Court found it troubling there "ha[d] been no individualized findings that these particular witnesses needed special protection." (*Coy*, at p. 1021.) The Supreme Court left "for another day . . . the question whether any exceptions exist" to the right to face-to-face confrontation. (*Ibid.*)

A few years later, the Supreme Court identified one such exception, a narrow one—"the State's traditional and transcendent interest in protecting the welfare of children" may be "sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court." (*Craig*, *supra*, 497 U.S. at pp. 853, 855, internal quotations omitted.) In *Craig*, the trial court had applied to four young witnesses a Maryland statute authorizing a closed-circuit television procedure for examining children in a separate room while the judge, jury, and defendant remained in

the courtroom. (*Id.* at pp. 841, 843.) The trial court found the accommodation necessary after the prosecution presented expert testimony the child witnesses, one of whom was six years old, "would suffer 'serious emotional distress such that [they could not] reasonably communicate.'" (*Id.* at p. 842, brackets in original.) In upholding the accommodation, the Supreme Court announced a new rule: "[W]e hold that, if the State makes an adequate showing of necessity, the state interest in protecting *child witnesses* from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant." (*Id.* at p. 855, italics added.)

*Craig* established a two-part test. First, "[t]he trial court must hear evidence and determine whether" the accommodation "is necessary to protect the welfare of the particular *child witness* who seeks to testify." (*Craig*, *supra*, 497 U.S. at p. 855, italics added.) The trial court must then make a "case-specific finding" that "the child witness would be *traumatized*" if made to face the defendant in court. (*Id.* at pp. 855-856, 860, italics added.) De minimis "emotional distress" like "nervousness or excitement or some reluctance to testify" will not suffice. (*Id.* at pp. 841-842, 855-856, 860.)

Second, because it will invade the right to face-to-face confrontation, the accommodation must preserve the confrontation right's other "safeguards of reliability"—"oath, cross-examination, and observation of the witness' demeanor." (*Craig*, *supra*, 497 U.S. at p. 851.) The Supreme Court approved of Maryland's statutory

6

procedure because it ensured that "the defendant retains full opportunity for contemporaneous cross-examination; and the judge, jury, *and defendant* are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies." (*Ibid.*, italics added.)

California has a statute similar to Maryland's. Penal Code section 1347 authorizes the use of a closed-circuit television procedure for examining a child *13 years of age or younger*. (Pen. Code, § 1347, subd. (b).) Penal Code section 1347 states it is intended "to provide the court with discretion to employ alternative court procedures to protect the rights of a child witness, the rights of the defendant, and the integrity of the judicial process . . . This discretion is intended to be used *selectively* when the facts and circumstances in an individual case present *compelling evidence* of the need to use these alternative procedures." (Pen. Code, § 1347, subd. (a), italics added.) A court may not order the use of the closed circuit procedure unless it finds (1) "[t]he impact on the minor . . . is shown by *clear and convincing evidence* to be *so substantial as to make the minor unavailable* as a witness unless closed-circuit testimony is used" and (2) "[t]he equipment available for use of closed-circuit television would accurately communicate the image and demeanor of the minor to the judge, jury, *defendant or defendants*, and attorneys." (Pen. Code, § 1347, subd. (b), italics added.) Penal Code section 1346 defines "unavailable" as suffering "emotional trauma" so severe "that the victim is medically unavailable or otherwise unavailable within the meaning of Section 240 of the Evidence Code." (Pen. Code, § 1346, subd. (d).)

7

Penal Code section 1347 satisfies both parts of *Craig's* test because it requires (1) a finding that the procedure is *necessary* to prevent *emotional trauma* so severe the child would be rendered *incommunicative* and (2) a finding that the procedure does not invade the defendant's *ability to view the witness as the witness testifies*. Indeed, the Supreme Court appeared to approve Penal Code section 1347 in *Craig*, citing to it as one of eight state statutes offering a "two-way" television feed that gives each room a view of the other. (*Craig*, *supra*, 497 U.S. at p. 854, fn. 4.)

The foregoing authority is entirely focused on child witnesses. By its terms, *Craig* does not apply to adult witnesses. Instead, the Supreme Court was concerned with the unique issues child witnesses pose. It cited to a "growing body of academic literature documenting the psychological trauma suffered by child abuse victims who must testify in court" and observed that a majority of states have statutory procedures designed to protect child witnesses from the emotional distress of testifying about sexual abuse in court.[1] (*Craig*, *supra*, 497 U.S. at pp. 853-855.) Courts have traditionally afforded children greater protections precisely because of their vulnerability and lack of experience. (*Globe Newspaper Co. v. Superior Court of Norfolk County* (1982) 457 U.S. 596, 607; see also *New York v. Ferber* (1982) 458 U.S. 747, 756-757; *FCC v. Pacifica Foundation* (1978) 438 U.S. 726, 749-750; *Ginsberg v. New York* (1968) 390 U.S. 629, 640; *Prince v. Massachusetts* (1944) 321 U.S. 158, 168.) As the Supreme Court

---

[1] The Second District extended the exception in *Craig* to apply to *nonvictim* child witnesses, but did so based on the same concerns over the particular vulnerability of children. (*People v. Lujan* (2012) 211 Cal.App.4th 1499, 1502.)

8

explained in *Craig*: "[A] State's interest in 'the protection of minor victims of sex crimes from further trauma and embarrassment' is a 'compelling' one. '[W]e have sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights.' . . . [We have] held that a State's interest in the physical and psychological well-being of a minor victim was sufficiently weighty to justify depriving the press and public of their constitutional right to attend criminal trials, where the trial court makes a case-specific finding that closure of the trial is necessary to protect the welfare of the minor." (*Craig*, at p. 852.)

The question we face in this appeal is whether, under *Craig* and its progeny, the record supports accommodating an *adult* witness by placing an *opaque barrier* between her and her accused abuser. In upholding the accommodation, the majority relies almost entirely on *People v. Sharp* (1994) 29 Cal.App.4th 1772 (*Sharp*) and *People v. Gonzales* (2012) 54 Cal.4th 1234 (*Gonzales*). I find those cases unhelpful. First, they involve child witnesses, not adult witnesses. Second, the accommodations in those cases *preserved* the defendants' ability to view the witnesses as they testified. Third, both cases involved much more evidence of the need for the accommodation. As a result, I do not believe *Sharp* and Gonzales provide the majority a sound basis for its decision.

In *Sharp*, the trial court allowed the young witness (who was 8 or 9 years old) to turn to the side and face the jury while testifying. (*Sharp*, *supra*, 29 Cal.App.4th at p. 1783.) Before the accommodation, the witness was becoming incommunicative on the

9

stand, suffering inexplicable memory lapses about incidents she had previously consistently reported, and providing inconsistent, evasive, and confused testimony. (*Id.* at pp. 1783-1784.) Even with the accommodation, the defendant still had a view of the witness's face, just not a "full, frontal view." (*Ibid.*) The *Sharp* court described the accommodation as causing "only the most minimal interference with appellant's right to confront his accuser" precisely because "*[n]o physical barrier or screen was erected between appellant and the witnesses as they testified.*" (*Ibid.*, italics added.) Although the trial court had not made any explicit findings of necessity, the appellate court inferred such a finding based on its conclusion the trial transcript demonstrated the witness was "experiencing considerable distress." (*Id.* at p. 1783.)

In *Gonzales*, the trial court allowed a similar accommodation for the eight-year-old boy who was called upon to testify against his parents in a first degree torture-murder case. (*Gonzales*, *supra*, 54 Cal.4th at pp. 1242, 1247, 1261.) At the preliminary hearing, the child testified while "seated at an angle, not directly facing the defendants" and the video of his testimony was played during trial under Evidence Code section 1291, which provides a hearsay exception for former testimony when the witness is unavailable. (*Gonzales*, at pp. 1261, 1265.) On appeal, the child's father asserted the arrangement at the preliminary hearing violated his confrontation rights but "[did] not challenge the trial court's ruling that [his son] was unavailable because of the trauma that he would suffer if made to testify against his parents at their capital trials." (*Id.* at pp. 1261, 1268.)

More on point is *People v. Murphy* (2003) 107 Cal.App.4th 1150 (*Murphy*), which involves an adult witness and a physical barrier accommodation. In *Murphy*, the trial court permitted the 31-year-old witness to testify about the defendant's sexual abuse behind a one-way screen that blocked her view of the defendant but allowed everyone else in the courtroom, including the defendant, to see her. (*Id.* at p. 1152.) The record revealed the witness had testified for an afternoon before the trial court permitted the accommodation, which the court found necessary based on its observation of the witness: "'To say that the victim in this case while testifying is severely emotionally distraught is like saying the ocean is rather damp. She has been engaging in a hyperventilation that we have heard described in other contexts by her cousin. She has been making marked spasmodic motions of her head and neck relating to her breathing abilities, I suspect. She has been crying and sobbing. She has been making 'keening' type noises that at times make it difficult to hear her testimony. [¶] As the record will reflect, we took one or more breaks yesterday just in an effort to try to allow her to feel more comfortable. Again, that's sort of an understatement as well. [¶] A reading of the preliminary hearing transcript would suggest that during that hearing paramedics were required to treat her on the same sort of issues that she has.'" (*Ibid.*)

Despite the trial court's explanation, the Second District concluded the accommodation was unconstitutional because (1) it was not clear the exception in *Craig* could ever appropriately apply to adults and (2) the trial court had not made the case-specific findings required in *Craig*. The *Murphy* court stated, "Even assuming that, in an

11

appropriate case, the court might allow a testifying adult victim, who would otherwise be traumatized, to use a one-way screen to avoid seeing a defendant without violating the right of confrontation, we do not think a court may do so without making the necessary factual findings based upon evidence." (*Murphy*, *supra*, 107 Cal.App.4th at p. 1158.) The court concluded the accommodation failed to satisfy the first part of the *Craig* test because the trial court had failed to "hold[] an evidentiary hearing to determine *whether, and to what degree*, the testifying victim's apparent anxiety was due to the defendant's presence rather than, for instance, the witness's general emotional fragility or the trauma of testifying in court or revisiting a past experience the witness would rather not recall." (*Murphy*, at pp. 1157-1158, italics added.)

In my view, *Murphy* provides guidance for analyzing the accommodation in this case and demonstrates how the trial court failed to properly safeguard Arredondo's confrontation right. The trial court sanctioned a *more invasive* physical barrier than the one struck down in *Murphy* on *less compelling* evidence of trauma.

The majority provides no authority to suggest the state has an interest in protecting adult witnesses that is similarly "traditional and transcendent" as the state's interest in protecting child witnesses. (*Craig*, *supra*, 497 U.S. at pp. 855-856.) While I agree trial courts may be justified in accommodating *some* adult witnesses in *some* circumstances despite treading on the right to face-to-face confrontation (see *Williams*, *supra*, 102 Cal.App.4th 995), I would not go so far as the majority, which seems to say as long as the abuse occurred when the witness was a child, *Craig* does apply. (Maj. opn. *ante*, at

12

pp. 34-35 [arguing the state "has an interest in protecting the *former* child from the trauma of face-to-face confrontation"].)

There are important reasons to accommodate child witnesses that do not apply to adults. The majority's own case law acknowledges this fact. "When the victim witness is a young child, the risks of damage to both the witness and the truth-seeking function can be especially great." (*Sharp*, *supra*, 29 Cal.App.4th at p. 1786, citing Cecchettini-Whaley, *Children as Witnesses After Maryland v. Craig* (1992) 65 So.Cal.L.Rev. 1993, 2005-2018 (Cecchettini-Whaley).) Psychological studies have shown "the distress the child would experience would be worse than that of a testifying adult" as "[c]hildren . . . have not yet developed to the point that they can understand the legal system and its procedural requirements, including the necessity of facing those who have tormented them and of having their own credibility put on trial." (Cecchettini-Whaley [*2006].) "[T]here are several reasons to predict greater stress for children. The situation will be more novel and less predictable for the child than for adults; the sight of the defendant may be particularly disturbing because the child might believe that the defendant will retaliate against the child in the courtroom; or the child may think that he or she, rather than the defendant, will be sent to jail or taken from home." (Goodman & Helgeson, *Child Sexual Assault: Children's Memory and the Law* (1985) 40 U. Miami L.Rev. 181, 203.)

*Williams* is the only California decision to uphold an accommodation eliminating a defendant's ability to see an adult witness as she testified. (*Williams*, *supra*, 102

13

Cal.App.4th 995.)  However, the facts of that case are extraordinary and, for that reason, I do not think it provides a sound basis for approving the accommodation used here.  The witness in *Williams* was a physically and mentally disabled adult who had been called to testify against her abusive boyfriend.  (*Id.* at pp. 998-999.)  At the hearing on whether she needed accommodation, her psychotherapist and physician testified she would become suicidal and incommunicative if forced to face the defendant in court.  (*Id.* at pp. 998, 1004-1006.)  To avoid this likelihood of "grave harm," the trial court permitted the witness to testify in another room while the defendant listened from a detention cell and was able to confer with his counsel during cross-examination, though he could not see her.  (*Id.* at pp. 1006, 1008.)  The Second District approved the extension of *Craig's* narrow exception to the disabled adult witness but only because of the compelling evidence of necessity to protect a vulnerable witness.  (*Williams*, at p. 1008.)

Our Sixth Amendment case law is founded on the widely recognized principle that children are especially vulnerable and the state has a compelling interest in assuring they are protected when called upon to testify against their abusers.  As a general matter, the law does not find it necessary to protect adult witnesses to the same degree.  *Williams* provides an example of when it may be proper to consider an adult witness vulnerable, but the vulnerability in that case was both extreme and extremely developed.  Here, with insufficient support from the record, the majority concludes our young adult witness was "no less vulnerable than a minor."  (Maj. opn. *ante*, at p. 35.)  As I will explain *post*, the little we know about F.R.'s reaction to taking the stand does not indicate she was as

14

vulnerable as a young child. But even if the record did warrant an extension of the *Craig* exception, the trial court failed to satisfy both parts of the *Craig* test in selecting and implementing the accommodation.

B.     *The Accommodation Violated Arredondo's Confrontation Right*

1.     *Factual background*

The following exchange occurred during Arredondo's trial. F.R., the prosecution's 18-year-old victim witness, began to cry on the stand as she was being sworn in. The court asked her if she needed a moment and she responded, "I think so." The court then called a brief recess and told the prosecutor to have F.R.'s support person confer with F.R. and "let me know if she is able to proceed or ready to proceed and we will resume." The prosecutor said she would ask F.R. if she preferred the support person to sit behind her, and the court responded, "Oh, yes. Right. If there's something like that that you can do that would make her more comfortable, I'm fine with that."

During the recess, the exhibit monitor in the witness box was repositioned and books placed underneath it so that it blocked F.R.'s view of Arredondo. Defense counsel objected to the accommodation on the ground F.R. was not a child witness and the monitor also blocked Arredondo's entire view of F.R. Counsel explained, "I object to my client being unable to view the witness as the witness testifies in that his knowledge of the witness would be able to assist counsel in her demeanor and looks, you know, as the quasi-parent. He is aware of how the witness looks when the witness is maybe not telling the truth or when the witness is feigning something. I don't have that knowledge. I have

15

never seen this witness before.  And [Arredondo] is unable to assist me in that regard because he is unable to see the witness."

The court responded, "for the record, when she first came in to take the oath, she was unable to proceed at that time.  We took about a 15-minute break before she could get her emotions back in order."  The court explained the monitor had been "repositioned so that the witness doesn't have to look at [Arredondo]."  The court added that it believed the accommodation was "appropriate given her initial reaction."

Defense counsel responded F.R. had started crying when she "first came in . . . before she was even able to see [Arredondo's] face.  So [Arredondo] made no effort to look at her, intimidate her, or make any kind of eye contact or suggestive contact with her."  The court replied, "I understand.  I'm not casting any aspersions at this point.  But it clearly affected her, and I think it's appropriate for the Court to take whatever small efforts the Court can make to make the witness more comfortable without infringing on [defendant's] constitutional rights, and I don't believe that his rights have been infringed on at this point."  The monitor remained in place as 14-year-old A.J.R. and 13-year-old A.M.R testified.

The preceding is the trial court's entire necessity analysis.  The court observed F.R. had been emotionally "affected" upon taking the witness stand, then, for the stated purpose of making her "more comfortable," it permitted an accommodation that blocked her view of Arredondo and vice versa.

16

2.	*Analysis*

We review claims of confrontation right violations de novo and apply the substantial evidence standard to the trial court's factual findings—whether those findings are express or ones we infer from the record.  (*People v. Lujan*, *supra*, 211 Cal.App.4th at p. 1505; *People v. Powell* (2011) 194 Cal.App.4th 1268, 1284, fn. 6.)  We defer to the trial court's determination of historical facts, but not its application of the constitutionally based legal test to those historical facts.  (*People v. Giron-Chamul* (2016) 245 Cal.App.4th 932, 964.)

The cases do not explicitly address whether we review for substantial evidence to support necessity by clear and convincing evidence or a preponderance of the evidence.  By statute, when the prosecution seeks to present the testimony of a witness who is 13 years old or younger by live television feed, *the prosecution* must present *clear and convincing evidence* of trauma so great as to render the witness unavailable.  (Pen. Code, § 1347.)  By requiring clear and convincing evidence of serious emotional distress, the California Legislature "sought to make closed-circuit television testimony available to child witnesses under circumstances that, in the lawmakers' view, would preserve a defendant's Sixth Amendment confrontation rights as outlined in *Craig*."  (*People v. Powell*, *supra*, 194 Cal.App.4th at p. 1282.)  In other words, in the case of *younger* witnesses and *less invasive* accommodations than the one used here, the Legislature views the heightened clear and convincing evidence standard necessary to protect a defendant's confrontation rights.

It remains an open question what standard of proof should apply when the witness is older than 13 or the accommodation is something other than a closed-circuit television procedure allowing the defendant to see the witness during examination. Arguably, where the witness is 18 years old and the accommodation is a physical barrier, the standard of proof should be at least as stringent as the standard in Penal Code section 1347. I note the issue, but need not resolve it because in my view this sparse record satisfies neither prong of the *Craig* test, even if I look for substantial evidence to support a finding based on the lower standard of proof.

          a.      *Necessity*

The trial court did not find the accommodation necessary, as required by *Craig*. The court should have determined whether F.R. would suffer severe emotional distress to the point of becoming incommunicative if made to confront Arredondo while testifying. Instead, the court determined F.R. was emotional or uncomfortable. The court compounded the error by failing to ascertain the cause and degree of F.R.'s discomfort. Indeed, the court observed F.R. *was no longer emotional* when the monitor was repositioned. On this record, concluding the accommodation was necessary is pure speculation.

A fair reading of the transcript shows it is highly likely the court could have accomplished its goal of making F.R. more comfortable with far less drastic measures, such as by simply repositioning her support person. In fact, the court seemed to be thinking along those very lines before it permitted the use of the monitor as a visual

18

barrier.  At the start of the recess, the court told the prosecutor it would be willing to let the support person sit behind F.R., stating, "the law allows it."  While I am sympathetic to the discomfort and distress a sexual assault victim like F.R. might feel when called to recount her experience in court, I believe *Craig* requires courts to ensure an accommodation is *necessary* before infringing upon a defendant's constitutional rights— and what the court did here is a far cry from that.

As the proceedings recounted above demonstrate, at no point did the court *explicitly* find that F.R. would be unable to reasonably communicate without a physical barrier between her and Arredondo.  The majority faults Arredondo for the lack of an explicit finding, pointing out he failed to request a hearing on the need for the accommodation.  (Maj. opn. *ante*, at pp. 32, 34.)  However, it is the prosecution's burden to demonstrate the accommodation it seeks is necessary, not the defendant's burden to prove the accommodation is unnecessary.  *Coy* and *Craig* speak to the protections our federal constitution affords criminal defendants and what trial courts—not the accused— must do to safeguard them.  Arredondo satisfied his burden by objecting to the accommodation on the ground it violated his right to face-to-face confrontation.

As for an *implied* finding, the fact the court remarked F.R. had been "unable to proceed" when she took the stand and started crying is too slim a basis to support an inference that F.R. needed the accommodation.  Indeed, the record reveals the recess actually had the intended effect of allowing F.R. to recompose herself.  The court

19

permitted the accommodation despite its observation that during the recess F.R. had been able to "get her emotions back in order."

*Craig* defines an accommodation as necessary when a child witness would be so "traumatized" by a defendant as to be unable to "reasonably communicate" if made to face him in court. (*Craig*, *supra*, 497 U.S. at pp. 841-842, 855-856.) Penal Code section 1347 defines necessity as "suffering serious emotional distress so [as to be] . . . unavailable as a witness." (Pen. Code, § 1347, subd. (b)(2)(A).) In my view, there is simply nothing in this record to support such a finding. To the contrary, I believe the record shows the court did not understand the seriousness of its action. It characterized the accommodation as a "small effort . . . to make the witness more comfortable."

Additionally, I believe the holding in *Murphy* shows why we should not infer necessity here. The witness's distress in *Murphy* was much more severe than F.R.'s. The trial court stated for the record that it had observed the witness hyperventilate, sob, make spasmodic motions with her head and neck, and utter "keening" noises that made it hard to hear her testimony. (*Murphy*, *supra*, 107 Cal.App.4th at p. 1152.) However, because the trial court did not request evidence to determine "to what degree" the witness's distress was due to the defendant as opposed to "general emotional fragility," the appellate court refused to infer necessity from the record. (*Id*. at pp. 1157-1158.)

At most, our record supports a finding that F.R. cried as a result of seeing defendant in court. I say *at most* because there are other explanations for F.R.'s distress upon taking the stand, and the trial court made no effort to identify the precise reason for

20

her discomfort. I find it significant that when it approved the accommodation, the trial court had already observed F.R. was "fairly immature" as the basis for allowing the prosecution to ask leading questions of her. Thus, on the limited record before us, there is no way to tell whether F.R. cried because she was scared of defendant or because, being somewhat immature for her age, she was reluctant to testify in court and revisit disturbing past experiences. (Cf. *Murphy*, *supra*, 107 Cal.App.4th at pp. 1157-1158.)

The majority concludes the court must have found Arredondo to be the source of F.R.'s discomfort because the entire discussion of the accommodation "was based on F.R. being too upset to testify *because* she had to face defendant." (Maj. opn. *ante*, at p. 29.) This reasoning is circular. The prosecution argued F.R. needed the accommodation because Arredondo made her uncomfortable, but counsel's representations are not evidence. As it is, we simply do not know why F.R. cried when she took the stand. It could be the sight of Arredondo made her distraught, but it could just as easily be she was nervous to testify about her sexual abuse. It was the prosecution's burden to prove Arredondo's presence caused the problem and the court's obligation to ensure it was proven. Both failed.

Finally, *Sharp* and *Gonzales* do not support inferring a finding of necessity, as the majority concludes. The *Gonzales* court had no occasion to analyze the trial court's necessity finding because, as noted above, the defendant did not challenge that finding on appeal. (*Gonzales*, *supra*, 54 Cal.4th at pp. 1261, 1268.) *Sharp* is similarly unhelpful because the *record itself* demonstrated the child witness had attempted to testify but

21

could not reasonably communicate.  Our record contains no comparable evidence of "considerable distress" or inability to communicate.  (*Sharp*, *supra*, 29 Cal.App.4th at p. 1783.)

b. *Accommodation type*

The accommodation also fails to satisfy the second part of the *Craig* test.  A physical barrier blocking the defendant's and witness's views of one another is the most "obvious [and] damaging" type of accommodation.  (*Coy*, *supra*, 487 U.S. at p. 1020.)  As the Supreme Court has explained, the ability to view the witness's demeanor allows the defendant to assess credibility and perhaps even "'undo the false accuser, or reveal the child coached by a malevolent adult.'"  (*Ibid*.; *Craig*, *supra*, 497 U.S. at p. 851.)  In a similar vein, "A witness 'may feel quite differently when he has to repeat his story looking at the man whom he will harm greatly by distorting or mistaking the facts.'"  (*Coy*, at p. 1019.)

Arredondo's inability to assess F.R.'s demeanor, and therefore credibility, as she testified is precisely why his counsel objected to the monitor setup.  Because he occupied the role of F.R.'s stepfather, Arredondo knew her personality and mannerisms well and would be better able than his counsel to tell if she were being less than truthful.

The majority concludes the accommodation satisfied the second part of the *Craig* test because "F.R. testified under oath, subject to cross-examination, and the jury had an unobstructed view of [her] while she testified."  (Maj. opn. *ante*, at p. 27.)  However, as *Coy* and *Craig* make clear, it is *the defendant's* view of the witness (and vice versa) that

22

is most crucial, not the jury's. (*Coy*, *supra*, 487 U.S. at pp. 1015-1020; *Craig*, *supra*, 497 U.S. at pp. 844, 846-847, 851.)

At any rate, even with its clear view of F.R., the jury's ability to assess her demeanor was limited because she did not have to look at Arredondo while testifying. (*Craig*, *supra*, 497 U.S. at p. 851.) As the Supreme Court observed in *Coy*: "It is always more difficult to tell a lie about a person 'to his face' than 'behind his back.' In the former context, even if the lie is told, it will often be told less convincingly. The Confrontation Clause does not, of course, compel the witness to fix his eyes upon the defendant; he may studiously look elsewhere, but the trier of fact will draw its own conclusions." (*Coy*, *supra*, 487 U.S. at p. 1019.) The accommodation used here removed that factor from the jury's consideration because it allowed F.R. to look straight ahead while testifying without having to face Arredondo.

The majority relies on *Craig*, *Sharp*, and *Gonzales* to uphold the physical barrier accommodation used here, but in those cases the courts upheld the accommodations at issue *precisely because* they did *not* obscure the defendant's view of the witness. In *Craig*, the Supreme Court endorsed the closed-circuit television procedure because the defendant retained the "ab[ility] to view (albeit by video monitor) the demeanor (and body) of the witness[es]" as [they] testified. (*Craig*, *supra*, 497 U.S. at p. 851.) In upholding the trial court's decision to let the witness look toward the jury while testifying, the *Sharp* court sanctioned the accommodation for causing "only the most minimal interference with appellant's right to confront his accuser" because "[n]o

23

physical barrier or screen was erected between appellant and the witnesses as they testified." (*Sharp*, *supra*, 29 Cal.App.4th at p. 1783.) The accommodation in *Gonzales* was just as minimal—the child witness was "seated at an angle, not directly facing the defendants." (*Gonzales*, *supra*, 54 Cal.4th at p. 1265.)

Disregarding those parts of *Craig*, *Sharp*, and *Gonzales*, the majority characterizes the screen placed in front of F.R. as "the most minimal intrusion possible on defendant's confrontation rights." (Maj. opn. *ante*, at p. 42.) There is no support in the case law for the claim that an opaque physical barrier blocking the defendant's and witness's views of one another is a minimal, let alone *the most* minimal, intrusion to face-to-face confrontation. As noted earlier, the Supreme Court has described such physical barriers as the most "obvious" and "damaging" violation of the face-to-face confrontation right. (*Coy*, *supra*, 487 U.S. at p. 1020.) However, the majority sees no problem with the screen because it was "part of the normal courtroom setting" and therefore it might not have been "obvious" to the jury that the screen was being used to keep F.R. and Arredondo from seeing one another. (Maj. opn. *ante*, at p. 44, fn. 8.) This endorsement stems from a misunderstanding of the Supreme Court's clear guidance that using *any* physical barrier is an obvious infringement of the face-to-face confrontation right.

The majority appears to read the Court as saying, so long as an accommodation is not *obvious to the jury*, its interference with the confrontation right is minimal. But this is not what the *Coy* court meant when it said: "It is difficult to imagine a more obvious or damaging violation of the defendant's right to a face-to-face encounter" than a "screen

24

. . . specifically designed to enable the complaining witnesses to avoid viewing appellant as they gave their testimony." (*Coy*, *supra*, 487 U.S. at p. 1020.) "Obvious," in that statement, modifies how conspicuous the constitutional error is to the reviewing court—it does not describe whether the accommodation jumps out at an observer of the events, like the jury. The critical point is that an accused must be able to observe the witness against him and assist his counsel in exploring the veracity and credibility of his accuser.

The majority is not mistaken, however, to recognize that the jury also has a critical role in this exchange. Jurors must be able to observe the witness and pass ultimate judgment on her veracity and credibility as tested by effective cross-examination. For this reason, it is relevant whether the accommodation is visible to the jury and in the forefront of jurors' minds as they hear the witness's testimony. An "obvious" barrier may rightly lead the jury to regard the witness with more skepticism. But a "non-obvious" barrier, like the one here, is likely to mislead the jury into giving a witness the same credit she would be due if she confronted the accused face-to-face, thus exacerbating the harm to the defendant.

I recognize trial courts "are regularly called upon to make tough decisions about how to afford criminal defendants the full measure of procedural protections to which they are entitled under the confrontation clause, without unduly traumatizing victim witnesses whose contributions to the truth-seeking process are so vital." (*Sharp*, *supra*, 29 Cal.App.4th at pp. 1785-1786.) I am also mindful that "[t]rial courts also possess a constitutionally conferred, inherent authority to 'create new forms of procedures' in the

25

gaps left unaddressed by statutes and the rules of court." (*Lujan*, *supra*, 211 Cal.App.4th at p. 1507.)  But there are limits to the authority to resolve practical problems in conducting a trial.  "[C]ourts must tread carefully when exercising their inherent authority to fashion new procedures.  We may not sanction procedures of dubious constitutional validity." (*Ibid.*)

Here, without any indication F.R was traumatized to the point she would not be able to reasonably communicate, the trial court imposed the most drastic of all accommodations—it erected a "physical barrier or screen . . . between appellant and the witnesses as they testified." (*Sharp*, *supra*, 29 Cal.App.4th at p. 1783.)  I view this procedure as a clear violation of Arredondo's constitutional rights and therefore cannot agree with the majority view that the barrier was "far less intrusive than any other alternative procedure would have been." (Maj. opn. *ante*, at p. 43.)  A survey of the various alternate procedures appellate courts have upheld reveals nothing as invasive to the face-to-face confrontation right as the accommodation used here.  (See *People v. Johns* (1997) 56 Cal.App.4th 550, 556  [allowing child's mother to sit next to him as a support person during testimony]; *People v. Chenault* (2014) 227 Cal.App.4th 1503, 1520 [permitting two children to testify with a support dog]; *Sharp*, at pp. 1780-1786 [allowing child witness to testify angled away from defendant]; *In re Amber S.* (1993) 15 Cal.App.4th 1260, 1266 [permitting one-way, closed-circuit TV in juvenile proceedings where Penal Code section 1347 does not apply].)  Indeed, as the majority acknowledges,

other jurisdictions do not allow opaque barriers of any sort, regardless of size, shape, or what the jury may think of them. (Maj. opn. *ante*, at p. 43, fn. 8.)

The majority emphasizes its holding "is a narrow one . . . based on the particular facts of this case." (Maj. opn. *ante*, at p. 28.) The majority explains, "[t]he older a child abuse victim is when called upon to testify about the abuse, the more difficult it will likely be for the state to make an 'adequate showing of necessity' for using an alternative procedure to face-to-face confrontation." (*Ibid.*) I find no comfort in this reassurance precisely because my colleagues approve the accommodation here based on such slight evidence of necessity. Under today's holding, as long as a witness *of any age* becomes emotional or shows some reluctance to testify and the trial court notes for the record that she appears distressed, the court may allow a physical barrier to be erected between her and her accused without fear of reversal.

The procedure the Supreme Court approved in *Craig* requires more. The trial court must *hear evidence* and make a *fact-specific finding* of trauma before it permits an accommodation invading the guarantee of face-to-face confrontation. (*Craig*, *supra*, 497 U.S. at pp. 851, 855-856.) The court in *Sharp* felt comfortable inferring such a finding from the record when the trial court failed to make an explicit finding. (*Sharp*, *supra*, 29 Cal.App.4th at p. 1783.) While I question whether it is appropriate to infer a finding of necessity given *Craig's* holding, I believe it is unreasonable to do so on this record.

27

C.      *The Unconstitutional Accommodation for F.R. Was Prejudicial*

The harmless-beyond-a-reasonable-doubt standard articulated in *Chapman v. California* (1967) 386 U.S. 18 applies to violations of the confrontation right.  (*Craig*, *supra*, 497 U.S. at p. 1021.)  In *Coy*, the Supreme Court explained how the standard applies in the specific context of face-to-face confrontation:  "An assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined *on the basis of the remaining evidence*."  (*Coy*, *supra*, 487 U.S. at pp. 1021-1022, italics added.)  Here, because the evidence of the charged sexual assaults against F.R. came entirely from F.R.'s testimony, it follows that the violation was prejudicial.  The prosecution did not present medical or physical evidence of those assaults and none of the other witnesses provided corroborating testimony.[2]  Accordingly, I would reverse Arredondo's convictions for the sexual assaults against F.R.—counts 3, 4, and 5.

D.      *Arredondo Forfeited His Claim as to A.J.R and A.M.R. and Did Not Receive Ineffective Assistance of Counsel*

I agree with the majority that Arredondo forfeited his claim of constitutional violation with regard to the use of the monitor accommodation during A.J.R.'s and

---

[2]  M.C. did testify Arredondo touched both her own and F.R.'s buttocks on one occasion in July 2013.  Had the prosecution included this incident in one of the counts related to F.R., I might find M.C.'s testimony sufficient evidence to conclude the constitutional violation did not prejudice Arredondo as to that count.  However, the information included date ranges for each count, and all of the assaults against F.R. were alleged to have occurred between May 2004 and May 2011.

28

A.M.R.'s testimony. (Maj opn. *ante*, at p. 33.) The decision whether to allow an accommodation is a witness-specific analysis and an objection with respect to one witness cannot stand as an objection regarding another. Additionally, it would not have been futile to object to using the monitor for A.J.R. and A.M.R. because the court based its use of the accommodation for F.R. on the fact she had become upset taking the stand. There is no evidence A.J.R. or A.M.R. had a similar reaction upon entering the courtroom, so it is possible the court would have granted a request to reposition the monitor for those witnesses.

I also agree with the majority that the failure to object did not constitute ineffective assistance of counsel. The majority cites as a reasonable tactical purpose for not objecting the possibility defense counsel believed the monitor would prevent A.J.R. and A.M.R. from becoming emotional as they testified and thereby potentially elicit sympathy from the jury. (Maj. opn. *ante*, at p. 35.) I believe a different or at least additional tactical decision may have been at play.

The record reveals the monitor was returned to its original position after A.M.R. testified in the prosecution's case in chief, then moved back to the obstructing position during A.J.R.'s and F.R.'s testimony in the defense case. Just before calling A.J.R. and F.R. as witnesses, defense counsel submitted photographs of Arredondo's penis and elicited testimony from an investigator that it had a noticeable pattern of discoloration. Defense counsel's sole purpose for calling A.J.R. and F.R. to the stand was to ask them if they could describe Arredondo's penis, in the hope they would fail to describe the

29

discoloration, raising doubt about their story. Given the awkward and uncomfortable subject matter, defense counsel may have calculated he was more likely to elicit helpful testimony from the girls if they were able to speak as if in a more clinical, less emotionally charged setting. Obscuring Arredondo behind a monitor might establish such conditions. I believe a defense attorney could reasonably make that tactical choice, so I cannot conclude defense counsel provided ineffective assistance. (*People v. Frye* (1998) 18 Cal.4th 894, 979-980.)

In summary, I would reverse Arredondo's convictions for counts 3, 4, and 5 and affirm the convictions for the remaining 11 counts (1, 2, 6-14) as well as the true finding the crimes were committed against more than one victim (Pen. Code, § 667.61, subd. (e)(4)). This would leave Arredondo with a sentence of 200 years to life plus the determinate term the trial court imposes on remand.

SLOUGH_____

J.

30